CITY OF TACOMA, WASHINGTON, et al., Plaintiffs,

v.

Cecil D. ANDRUS et al., Defendants,

The Puyallup Tribe of Indians et al., Intervening Defendants.

Civ. A. No. 77–1423.

United States District Court, District of Columbia.

Sept. 19, 1978.

Tobin & Covey, Washington, D. C., for City of Tacoma, Wash.

Michael Breeskin, David Albert Mustone, Washington, D. C., for plaintiffs.

James J. Clear, Dept. of Justice, Washington, D. C., for federal defendants.

Stuart F. Pierson, Harry R. Sachse, William H. Rodgers, Jr., Ann K. H. Simon, for intervening defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

Section 5 of the Indian Reorganization Act of 1934 authorizes the Secretary of the Interior, "in his discretion," to acquire land or any interest therein "for the purpose of providing land to Indians." 25 U.S.C. § 465 (1970). This case involves a dispute over the proper interpretation of this increasingly important but rarely litigated federal statute. The dispute arose when the Secretary, acting through an area director of the Bureau of Indian Affairs (BIA), began accepting title to various tracts of land in the Tacoma, Washington, area for the beneficial use of the Puyallup Tribe of Indians and certain of its enrolled members.

The area surrounding Tacoma largely coincides with the historic boundaries of the Puyallup nation. As a result of bargains, treaties, allotments, distress sales, and other factors, however, Puyallup landholding and activity in the area drastically declined to a point where the Tribe's continuity was threatened. The Secretary's trust takings are a response, however belated, to this situation and an attempt to restore some land and a modicum of self-support to this almost destitute Tribe and its members.

### I.

Tacoma is now an industrialized and settled area, 99% of whose inhabitants are non-Indians. The Secretary's action generated considerable local hostility, particularly since whenever the Tribe or any of its members became the beneficial owner, it renounced or disputed the civil, tax, and criminal jurisdiction of the city.

In August 1977, the City of Tacoma adjoining municipalities, and some local non-Indian residents filed this suit to enjoin the Secretary and his delegates from any future takings in trust. Extensive collateral relief was also sought, including a declaration that such lands as had been taken are subject to local taxation and regulation, notwithstanding their trust status. Plaintiffs applied for a temporary restraining order, and argument was heard. The issue became moot, however, when the Secretary offered to sign a "Consent Decree," under the terms of which further takings for the Puyallup Tribe or its members would be held in abeyance pending some resolution of the dispute by the Court.[1] Shortly thereafter the Tribe waived its sovereign immunity, and its motion to intervene as a party defendant under Rule 24(a) of the Federal Rules of Civil Procedure was granted.

The original complaint was diffuse and, even as subsequently amended, attempted to raise a number of nonjusticiable issues, some of which were later abandoned as irrelevant. The Tribe immediately moved to dismiss on several grounds, and defendants joined in this motion. Plaintiffs duly opposed, and the matter was fully, if somewhat confusingly, argued. Certain claims and parties were dismissed in a Memorandum Opinion issued on January 20, 1978. The Court refused to dismiss the entire complaint, however, because upon its reading of the statute, the validity of the trust takings rested upon questions of fact as well as law and thus could only be determined on a case-by-case basis. Moreover, although jurisdiction and venue technically existed, the Court expressed serious doubt as to the propriety of adjudicating these questions in such a remote jurisdiction.

Following the January Memorandum Opinion, plaintiffs filed yet another amended complaint, precipitating a further battery of motions. The Court encouraged the parties to consider a transfer to the Western District of Washington because of the absence of some parties in interest and the local aspects of the dispute. All parties strongly resisted transfer, however, because of the importance of prompt decision which could not be obtained by transfer due to the tremendous civil caseload in the Western District and the lack of any active federal judge sitting in the Tacoma Division. The Court in the end agreed to retain and adjudicate a *portion* of the case, namely the validity of the trust taking of those parcels of land the grantors and beneficial owners of which would appear and consent to the jurisdiction of the Court. The Court made it clear that in no event would it determine the extent of local jurisdiction over these or any other tracts, since this was a matter requiring adjudication by a court familiar with the laws and practices of the area. The Court indicated that following decision on the validity of trust takings properly before the Court the remainder of the case would be transferred.

## II.

The grantors and beneficial owners of four parcels intervened, and on July 5, 1978, an evidentiary hearing was held regarding these tracts. Relying primarily on documentary proof, plaintiffs presented one witness, a city engineer who testified that he had inspected a building on one of the tracts and found it to be in violation of several municipal code provisions. Defendants produced the area officer who authorized the takings and a policy-level official of BIA, both of whom related the policies of and factors considered in the trust land acquisition program. They testified that the BIA was well aware of the meager resources of the Puyallup Tribe, as well as other small tribes in the Pacific Northwest, and that the agency's practice in the area was to accept land in trust subject to the following guidelines:

---

1. The scope of this Consent Decree, signed by another Judge of this Court, has been uncertain from the outset. On its face the Decree purports to bind defendants only until a resolution of a proposed motion by plaintiffs for a preliminary injunction. Such a motion, however, was never perfected, and thus, although defendants have taken no land in trust in the interim, the parties have never resolved the continued validity of the Decree. It was accepted as in effect pending this opinion.

(a) That the title to the parcel of land be clear of all tax liens or other encumbrances and that there be a commitment from a title company to insure the title;

(b) That the proposed beneficial owner be an enrolled member of an Indian tribe;

(c) That the parcel in question be within the boundaries of a reservation established for the tribe of which the proposed beneficial owner is a member;

(d) Where a proposed beneficial owner is not an enrolled member of the Tribe for which the reservation was set aside, the Tribal Council is to be advised of the proposed trust transfer prior to any approval.

The BIA exercises little or no control over land once it has been taken in trust. Under the Act it need assure itself only of its continued "beneficial use by the Indian occupant and his heirs." H.R.Rep. No. 1804, 73d Cong., 2d Sess. 7 (1934). Witnesses emphasized that if a parcel is located outside of reservation boundaries, a much more demanding scrutiny would be given to the trust proposal. With regard to the parcels in question, the BIA relied on the decision in *United States v. Washington*, 496 F.2d 620 (9th Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974), in establishing that all lay within existing reservation boundaries.

The Tribe produced the grantors and beneficial owners of the trust tracts in question, who described the tracts, the events surrounding each taking, and the policies and goals of the Tribe in general.

All of the tracts in question lie within the historic boundary of the Puyallup Reservation and within an outlying, nonindustrial area of Tacoma. The first tract was purchased by the Tribe in fee simple from non-Indians with a grant from the State of Washington. The Tribe then transferred title to the United States in trust. Situated on this five-acre tract is the Kwatee Group Home, a modern facility used as a residence and day facility for troubled Puyallup and other Indian children. The Home was partially funded by state grants and receives referrals from state courts.

The second tract, of 1.99 acres, was taken in trust for Roleen Hargrove, an enrolled Puyallup who was also the grantor. Ms. Hargrove bought the land with an inheritance of money that had been held in trust by the United States for her maternal grandmother.[2] The tract contains a small, wooden store, owned jointly with two other Puyallup women. The income from the store has been used largely, if not exclusively, for the benefit of the Tribe as a whole. The third tract is also held in trust for Ms. Hargrove, but is only 53 feet deep and borders on the main Hargrove tract and thus is of no independent significance.

The final tract in issue comprises about one-third of an acre. It was transferred to the United States by Marjorie Sterud, an enrolled Puyallup, to be held in trust for her son William. The tract has been in the Sterud family since its original allotment, and it is unclear how the land ever passed out of trust status. What is clear is that the land was heavily encumbered and had often been on the verge of distress sale. William Sterud worked to pay off the liens, and the land was accepted in trust. On it stands only a dilapidated shack which William hopes to convert into a decent home for his family.

What is missing from this necessarily short and sterile description is the pathos behind these attempts to restore trust land. The actors in these transactions are not wealthy individuals conniving ways to cheat the local government out of a tax dollar. They are not irresponsible illiterates creating disturbances and nonconforming structures in a downtown or industrial sector. They are self-respecting, and for that matter self-denying, people trying to preserve their tribe as a viable entity and to main-

2. Ms. Hargrove also owns an adjacent six-acre tract which the United States will not take in trust because it is encumbered by a mortgage.

tain themselves with a modicum of dignity and self-support. In one sense this is irrelevant because the BIA seemingly does not particularize these human factors when it decides whether or not to accept trust responsibilities. In the more important sense it is not: the Indian Reorganization Act was designed to assist tribes and enrolled members in just the circumstances here portrayed.

### III.

Analysis of the legality underlying the disputed takings in question necessarily begins with the language of the statute itself. In relevant part section 5 provides:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
>
> .    .    .    .    .
>
> Title to any lands or rights acquired pursuant to [this section] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465 (1970). Each party to the lawsuit offers a different sweeping or narrow interpretation of this language and urges the Court to impose a definitive gloss on its meaning. The Court must decline this broad invitation. Only four of the many parcels in dispute are before the Court. Moreover, the Secretary has recently proposed regulations interpreting section 5 and setting forth the appropriate conditions to govern future acceptances of title to land in trust for Indians. 43 Fed.Reg. 32311 (1978). A definitive exegesis at this juncture would thus be both advisory in nature and an invasion of the province of the Secretary to interpret, at least as an initial matter, the meaning of the Indian laws. *See generally United States v. Jackson*, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361 (1930). The Court is prepared, however, to rule on the validity of the particular takings in issue.

The legal basis of plaintiffs' opposition to the Secretary's action is fundamental. Arguing first from the face of the statute, plaintiffs emphasize that it authorizes trust takings only "for the purpose of providing land for Indians." Since the beneficial owners of all the trust land in question, or members of their immediate families, were also the grantors, they argue, the Secretary must have exceeded his authority. They suggest the Secretary could not be said to be "providing" land to Indians who themselves gave it to the United States. Moreover, plaintiffs argue, the legislative history of the Act indicates Congress' intention to limit its operation to takings for the benefit only of Indians who are landless or otherwise incapable of self-support.

■ Taking plaintiffs' latter argument first, it is sufficient to note that the words of the statute nowhere limit its application to landless, destitute, or incompetent Indians. The weight of the legislative history likewise support no such limitation. Congress was concerned with the overall problem of lost Indian lands and not with the resources of individual beneficiaries. The Act's House sponsor spoke on the floor in terms of tribes that had "lost *practically* every square foot of land" and "reservations [which] have in Indian ownership a *mere fragment* of the original land." 78 Cong.Rec. 11727–28 (1934) (Rep. Howard) (emphasis added). The goal of the Act was said to be "to build up Indian landholdings until there is sufficient land for all Indians who will beneficially use it." *Id.* at 11732. *See* S.Rep. No. 1080, 73d Cong., 2d Sess. 2 (1934). Repeatedly courts have approved trust takings in favor of Indians in no sense incapable of self-support. *E. g., Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (lease under § 5 to Tribe already in possession of 460,000 acres (BIA, Annual Report of Indian Lands 8 (1974)); *Stevens v. Commissioner*, 452 F.2d 741, 743 n.3 (9th Cir. 1971).

Plaintiffs' statutory argument—that the beneficial owner cannot himself provide the trust land—has a certain semantic appeal, and the Court itself, in its earlier Memorandum Opinion, expressed preliminarily its favor with such a generalized reading. Upon mature reflection, a closer analysis of the Act and its legislative history, and in light of the special facts underlying the disputed takings, however, the Court has concluded that plaintiffs' view is erroneous.

■ In the first place, on a literal level, the statute authorizes the Secretary to acquire land not only through "purchase, . . gift, exchange, or assignment," but by "relinquishment" as well. By its very meaning "relinquishment" contemplates precisely the transactions engaged in here—a surrender of *title* by the grantor in favor of a *beneficial interest.* Moreover, construing the Act so as to preclude an Indian or Indian Tribe from itself providing the land to be held in trust would make it unlikely that land would ever be taken in trust and thus would frustrate legislation designed first and foremost to help Indians regain through their own efforts lost land and the means of self-support. One cannot read the debates surrounding the Act without appreciating the groundswell of sympathy for the losses suffered by the Indian Tribes as a result of earlier allotment and inheritance laws. Hand-in-hand went the determination by Congress that the United States should aid in the recouping of these losses by restoring land to an inalienable status.[3] Since Congress has rarely appropriated money for the purpose of trust land, reliance has rested upon the Indians themselves, as the only interested parties, to provide either the land or the money to buy land to be taken in trust for their benefit. The latter has already been given express judicial approval. *See Stevens v. Commissioner,* 452 F.2d 741 (9th Cir. 1971). To hold that Indians may provide money but not land to come within the protection of section 5 would be the rudest exaltation of form over substance. As if it were necessary here, it is well to remember that " '[d]oubtful expressions are to be resolved' " in favor of the Indians. *Squire v. Capoeman,* 351 U.S. 6, 76 S.Ct. 611, 100 L.Ed. 883 (1956) (quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930)). The Court has no difficulty in holding that the Secretary may, in appropriate circumstances, take title to land to be held for the beneficial use of the very Indian or Indian Tribe that provided it.

## V.

■ Given its limited role in this overall lawsuit and the pendency of operative regulations, the Court will not proceed to detail what it considers to be appropriate circumstances for the exercise of the Secretary's "discretion." Suffice it to say that the takings in question do not even approach the periphery of the Secretary's discretionary power. The Puyallup Tribe, not long ago on the verge of extinction and even now with only a few acres of land, is a striking example of an entity the drafters of section 5 sought to aid. The heroic efforts of the Tribe, through its members, to improve itself were well known to the Secretary, and his willingness to take in trust lands within the historic boundaries of the Puyallup reservation was neither arbitrary nor irrational. He proceeded well within his discretion.

The trust takings reviewed above were within the power of the Secretary of the Interior under 25 U.S.C. § 465 (1970); the Consent Decree shall no longer have force and effect; and each and all remaining issues in the case are transferred to the Western District of Washington. Judgment shall be entered accordingly.

SO ORDERED.

---

**3.** For general statements as to the aims of the Act and the problems it sought to remedy, see, *e. g.,* 78 Cong.Rec. 11726–32 (1934) (Rep. Howard); letter from President Franklin D. Roosevelt to Sen. Burton K. Wheeler (Apr. 28, 1934), *reprinted in* S.Rep. No. 1080, 73d Cong., 2d Sess. (1934).