## CITY OF SAULT STE. MARIE, MICHIGAN, Plaintiff,

v.

## Cecil D. ANDRUS, et al., Defendants.

### Civ. A. No. 77–1388.

United States District Court, District of Columbia.

Aug. 29, 1980.
On Motion to Reconsider Dec. 12, 1980.

---

David Albert Mustone, Michael W. Breeskin, Earl R. Mettler, Tobin & Covey, Washington, D. C., Thomas G. Moher, City Atty., Sault Ste. Marie, Mich., for plaintiff.

Barbara N. Coen, Land and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

Richard B. Collins, Boulder, Colo., Daniel T. Green, Sault Ste. Marie, Mich., for Chippewa Indians of Sault Ste. Marie.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This case calls for review of action taken by the Secretary of Interior (Secretary) under the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. §§ 461–479. Section 5 of the IRA, 25 U.S.C. § 465, authorizes the Secretary to acquire lands and hold them in trust for American Indians.[1] That same section provides that such lands are exempt from local taxation,[2] and Chapter 53 of Title 18, United States Code, provides for federal criminal jurisdiction over such lands.[3] In the case at hand, the plaintiff municipality in the state of Michigan seeks review of the Secretary's decision in March, 1977, to exercise his powers under the IRA to accept a 76-acre tract within the plaintiff's boundaries. The Secretary is presently holding the land in trust for the intervening defendant, the Chippewa Indians of Sault Ste. Marie (Tribe), and the Tribe plans to construct a 65-unit federal housing

---

**1.** 25 U.S.C. § 465: "The Secretary of the Interior is hereby authorized, in his discretion, to acquire . . . any interest in lands, water rights, or surface rights to lands, within or without existing reservations . . . for the purpose of providing land for Indians."

**2.** 25 U.S.C. § 465: "Title to any lands or rights acquired . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation."

**3.** 18 U.S.C. §§ 1151–1165. *See* pp. 164–165, *infra*.

project thereon.[4] Apparently the plaintiff's main concern is that this decision by the Secretary will result in a loss of criminal and civil jurisdiction over the land, although tax revenues will also be affected.[5]

This case presents two basic issues: (1) whether the land was properly taken in trust, and (2) if so, whether the plaintiff nevertheless retains criminal and regulatory jurisdiction over the land. Both sides have moved for summary judgment on all issues. For the reasons below, the court is persuaded that the land was properly taken in trust, that the issue of criminal jurisdiction is not ripe for decision, and that the plaintiff may not exercise regulatory jurisdiction over the land.

*Discussion*

The plaintiff makes four basic arguments:

I. The Tribe was not officially "recognized" as such in 1934, the year of the passage of the IRA, and therefore does not qualify as a "tribe" for which land could be taken in trust under the IRA.

II. The drafters of the IRA intended that land should be taken in trust only for absolutely "landless" Indians, and because the Tribe here was not landless, the defendants acted improperly.

III. The plaintiff received no notice or opportunity to comment on the Secretary's decision, so because the decision will deprive the plaintiff of valuable property interests, it denies the plaintiff due process of law.

IV. Even if the land was properly accepted in trust, the land is nevertheless subject to the plaintiff's criminal and regulatory jurisdiction.

I. The plaintiff contends that the Chippewas do not constitute a "tribe" within the meaning of section 19 of the IRA, 25 U.S.C. § 479, which defines "tribe" as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." Section 19 defines "Indian" to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendents of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation . . . ."

Assuming, as the plaintiff argues, that in order to benefit from the IRA a tribe must have been federally "recognized" in 1934,[6] the question is whether the Chippewas were so recognized. According to the plaintiff, the first decision to accord recognition to the Chippewas as eligible for benefits under the IRA took place in a Memorandum of the Commissioner of Indian Affairs dated September 7, 1972. Conceding that the Memorandum refers to the Chippewas as an "historic band," the plaintiff argues that the absence in the Memorandum of any reference to the absolute requirement of federal recognition in 1934 reveals that the Secretary misconstrued his authority under the IRA. The plaintiff adds that in any event the Secretary could not reasonably have determined that the Chippewas were a

---

4. The parties indicate that funding by the Department of Housing and Urban Development is not dependent on the outcome of this case, so the housing construction will proceed regardless of which side prevails.

5. For the four years preceding the Secretary's taking of the land in trust, the plaintiff's tax yield from the tract was less than $100 each year.

6. The defendants grant this point arguendo, Defendants' Brief 5, and nowhere attempt to refute it. Additionally, the United States Court of Appeals for the Fifth Circuit commented in *United States v. State Tax Com'n of State of Mississippi*, 505 F.2d 633, 642 (5th Cir. 1974).

"The language of Section 19 positively dictates that tribal status is to be determined as of June, 1934, as indicated by the words 'any recognized Indian tribe *now* under Federal jurisdiction' and the additional language to that effect." Also supporting this position is the language of section 478, which provides, "It shall be the duty of the Secretary of the Interior, within one year after June 18, 1934, to call such an election [for purposes of establishing tribal status in order to obtain federal benefits], which election shall be held by secret ballot upon thirty days' notice." That this election was to be held only one year after the passage of the IRA suggests that the IRA was intended to benefit only those Indians federally recognized at the time of passage.

tribe within the meaning of the IRA. In support of this latter point it cites a second document, a 1937 Memorandum of the Acting Solicitor to the Commissioner of Indian Affairs, which indicates that the Chippewas should not be recognized for purposes of the IRA because the Chippewas were dissolved officially by a treaty of July 31, 1855, with the United States.

■■■ The court is persuaded that these arguments are amply met by opposing arguments of the defendants. First, although the question of whether some groups qualified as Indian tribes for purposes of IRA benefits might have been unclear in 1934, that fact does not preclude the Secretary from subsequently determining that a given tribe deserved recognition in 1934. The 1972 Memorandum constitutes just such subsequent recognition. To hold otherwise would be to bind the government by its earlier errors or omissions. Moreover, the apparent purpose of limiting IRA benefits to tribes recognized in 1934 was to prevent new groups from coming together solely to exploit the IRA, and there is no evidence or allegation that the Chippewas have engaged in such a scheme.

As for the plaintiff's argument that the 1972 Memorandum itself was clearly erroneous and that the treaty of July 31, 1855 dissolved the Tribe, it appears that what the treaty dissolved was an artificial amalgam of the Ottawas and the Chippewas, not the Chippewas themselves. *United States v. State of Michigan*, 471 F.Supp. 192, 264 (W.D.Mich.1979), remanded to consider the preemptive effects of subsequently passed federal regulations, No. 79–1414 (6th Cir. 1979) (per curiam). Moreover, there were two separate treaties of 1855, one of July 31 and one of August 2. *Id.* at 280. The July treaty is the one on which the plaintiff relies, yet the very existence of the later treaty indicates that the Tribe was federally recognized after the so-called dissolution treaty of July.

7. The defendants make two additional arguments that merit only brief consideration.

The defendants also cite *United States v. State of Michigan, supra,* in support of a claim of collateral estoppel on the issue of tribal recognition. Although the preceding determination removes the necessity for resolution of this argument, the likelihood of appeal renders it appropriate for the court to address the issues raised. *United States v. Michigan* involved fishing rights asserted by the Chippewas against Michigan officials, and the state argued that the Chippewas had no aboriginal fishing rights because they had voluntarily disbanded pursuant to the treaty of July, 1855. The district court ruled against the state, saying, "Ancestors and members of the plaintiff tribes have continuously exercised Indian fishing rights since the 1836 Treaty without abandonment .... [T]he Sault Ste. Marie Tribe of Chippewa Indians are Indian tribes which are political successors in interest to the Indians who were signatory to the Treaty of March 28, 1836...." *Id.* at 249. The defendants argue that because the plaintiff in this case was in privity with the state in *United States v. Michigan,* and because the very issue of whether the Chippewas were dissolved as a tribe in 1855 was decided in that case, the plaintiff here is collaterally estopped from raising that issue again.

■■■ The court is persuaded that that case constitutes significant support for the defendants' position, but it is not determinative under the doctrine of collateral estoppel. Although the issues decided there are manifestly related to those of the present action, they are not identical so as to warrant the defendants' claim of collateral estoppel. That the Chippewas hold certain fishing rights under the 1836 treaty with the United States does not necessarily mean they constituted a federally recognized tribe within the meaning of the IRA in 1934. On the other hand, that they were found to be the tribal successors of the Indians who were signatory to that treaty does constitute strong evidence to that effect, and the court is influenced accordingly.[7]

First, when the dispute over the trust status of the land initially arose, the United States filed

II. The plaintiff argues that because the Chippewas were not "landless," strictly speaking, the land could not properly be taken in trust for them. Judge Gesell rejected this very argument in *City of Tacoma v. Andrus*, 457 F.Supp. 342 (D.D.C.1978), and this court sees no sound reason to depart from this precedent. Recognizing that *City of Tacoma* is virtually impossible to distinguish, the plaintiff assaults it frontally, but the passages from the legislative history and the administrative decisions quoted by the plaintiff fail to support its position.

The plaintiff makes two other related arguments, both of which are similarly unconvincing. First, it argues that the decision to acquire the land in trust erroneously turned not on a need-for-land standard but on an "unusual circumstance" standard, and under *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), this flawed procedure fatally undermines the decision. The court is persuaded that the standard as articulated reflects a broad and thoroughly acceptable mode of analysis, particularly in view of the deference due to expert agencies. *Id.* at 824. Second, the plaintiff argues that the IRA prohibits the Secretary from holding lands in trust for the persons from whom the land was acquired. Here the Chippewas bought the tract and then gave it to the Secretary. The plaintiff contends that the IRA "clearly contemplates something more than the mere transferral of interests in already-owned land from fee to trust status for the same individual or tribe." Plaintiff's Brief 36. The IRA contains no express prohibition of such a step, however, and the plaintiff's attempt to infer such a prohibition from the language of section 465 is unavailing. The procedure followed here is entirely consistent with both the letter and spirit of the statute.

III. In response to the plaintiff's due process contention, the defendants make five arguments: (1) municipalities are not persons protected by the due process clause of the fifth amendment; (2) taxation and regulatory powers are not property interests protected by due process; (3) the plaintiff received actual notice and a hearing; (4) the notice and hearing requirements for which the plaintiff argues would entail excessive fiscal and administrative burdens for the defendants; and (5) because of the binding consent decree, which precludes most possible regulatory disputes between the plaintiff and the Tribe's housing project, and because of the minimal tax dollars at stake, the plaintiff cannot be harmed by the acquisition of the land in trust; therefore no notice and hearing were required.

The first of these arguments, that municipalities are not persons within the meaning of the fifth amendment, runs contrary to the weight of logic and clear precedent. *City of Santa Clara v. Andrus*, 572 F.2d 660, 675 (9th Cir. 1978); *Township of River Vale v. Town of Orangetown*, 403 F.2d 684, 686 (2d Cir. 1968) ("We hold that a municipal corporation like any other corporation is a 'person' within the meaning of the fourteenth amendment and is entitled to its protection.").

The second argument, that municipal taxing and regulatory powers are not property interests protected by the fifth amendment, is similarly unavailing. The main authorities cited by the defendants, *Bishop v. Wood*, 423 U.S. 890, 96 S.Ct. 2074, 46

suit in a United States district court in Michigan, *United States v. City of Sault Ste. Marie*, No. M–78–33 (W.D.Mich.1978). That action was resolved by a consent decree in which the plaintiff here agreed that the Chippewas were a tribe for the purposes of certain statutes *not* including the IRA. The Secretary contends that this agreement resolves the tribal recognition issue, precluding the plaintiff from propounding its present position. This argument must be rejected. A concession with respect to issues under one statute is not a concession with respect to issues under other statutes.

The Secretary also argues that this issue is a nonjusticiable political question. To the extent that the political question doctrine exists at all, *compare* Henkin, "Is There a 'Political Question' Doctrine?" 85 Yale L.J. 597 (1976), *with* L. Tribe, American Constitutional Law 71–79 (1978), this case does not fall within it. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

L.Ed.2d 121 (1976), and *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), deal with unrelated aspects of the due process clause and do not support their position. Contrary to the defendants' assertions, these taxing and regulatory powers more than "resemble" traditional property rights. Indeed, they represent significant values to which the plaintiff has a "legitimate claim of entitlement," *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and which may not be denied without due process. The defendants assert that such powers are not "compensable" and that they have no "exchange value," so they lack sufficient traditional attributes of property to support application of the due process guarantees. The error of this contention is revealed by, *inter alia*, the issuance of general revenue bonds, which involves municipal borrowing backed by the general taxing power. Such bonds reflect the economic significance of these powers, and this economic significance renders the defendants' argument meritless.

Because the plaintiff is a person within the meaning of the fifth amendment, and because the interests affected by the Secretary's action are property interests protected by the due process clause, the plaintiff was necessarily entitled to some due process of law. The remaining issue is whether the process that the plaintiff received was adequate to satisfy the fifth amendment. It is to this issue that the defendants' last three arguments pertain, and it is on this issue that the defendants prevail.

According to the plaintiff, it is "undisputed that the Federal Defendants accepted the 76-acre tract of land in trust without giving formal notice to the Plaintiff City and other interested parties, and without providing the City ... an opportunity to comment on the acquisition of that tract in trust...." Plaintiff's Brief at 39. It argues that due process requires, at a mini-

mum, (a) "appropriate notice," by which it means formal notice of the location and size of the property involved and the parties seeking to acquire the property, Plaintiff's Brief 43, 43 n. 48, and (b) an opportunity to submit written comments. The plaintiff contends that it received neither of these.

As the defendants contend in their third argument, the plaintiff received a great deal of actual notice in the form of newspaper articles, letters from interested persons, and even more direct communications with city officials. This is clear from the exhibits submitted by the defendants. The plaintiff itself states that what it failed to receive was "formal notice," and in response to the defendants' contention that the actual notice given was sufficient to satisfy the demands of due process, the plaintiff responds not with a claim of lack of actual notice but instead with a challenge to the adequacy of its opportunity to comment. Thus, the questions before the court are whether the plaintiff was entitled to formal notice rather than informal notice and whether its opportunity to comment, if any, was consistent with the demands of due process.

■ The Constitution itself defines what process is due when a property interest is infringed,[8] but due process is inherently flexible. *See Cafeteria & Rest. Wkrs. U., Local 473 v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) ("But 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."). In the circumstances here it is clear that the fundamental fairness required by due process was satisfied by the actual notice that the plaintiff re-

---

**8.** *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 1660, 40 L.Ed.2d 15 (1974) (White, J., concurring in part and dissenting in part: "While the State may define what is and what is not property, once having defined those rights the Constitution defines due proc-

ess...."); *id.* 94 at 1650–51 (Powell, J., concurring: "As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms.").

ceived. The extent of this actual notice was considerable, and there is no indication whatsoever that the plaintiff was prejudiced by the absence of formal notice.[9]

■ Moreover, and it is here that the defendants' fourth argument is germane, the court is persuaded that to require formal notice of the sort requested by the plaintiff, in addition to the informal notice actually received, would be to create an administrative obstacle that is unjustifiable at least in the case at hand. Such a requirement would be gratuitous. Where due process is at issue, the Supreme Court has mandated consideration of "the fiscal and administrative burden that the additional or substitute procedural requirement would entail," *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Here such consideration weighs clearly in favor of the defendants.

■ The defendants' fifth argument, that "the consent decree governing the housing project eliminates all significant effects on plaintiff for the taking in trust," Defendants' Brief 35, may also be treated in this context. This court is not persuaded that the consent decree eliminates all significant effects of the Secretary's action and thereby precludes application of the due process clause. Manifestly, that agreement does not remove all disputes between the parties, who disagree on its ramifications in terms of taxes and the application of various housing regulations. To be sure, such disputes might ultimately be resolved in favor of the defendants, thereby eliminating the plaintiff's property interests, as the defendants argue. It is hardly clear at present that this will occur, however, and this court is not the proper forum in which to determine the effects of the consent decree. On the other hand, that decree does remove some of the disputes between the parties, and to that extent it lessens the

plaintiff's stakes in the present action. Therefore, in view of the weighing of interests mandated by *Mathews v. Eldridge* in the context of due process disputes, the consent decree does add some—but not determinative—support for the defendants' position that no more process was due.

■ As for the plaintiff's contention that it was denied an opportunity to be heard, the court is again persuaded that the plaintiff received all that was constitutionally required. It appears from the defendants' second exhibit, an affidavit by Joseph Lumsden, the Chairman of the Board of Directors of the Sault Ste. Marie Tribe of Chippewa Indians, that on December 1, 1976, there was a public hearing called by the Sault Ste. Marie City Commission on the subject of trust status for the very land now in dispute. Attending this hearing were all members of the City Commission; other city officials; a representative of the Bureau of Indian Affairs, which is a branch of the Department of Interior; representatives of the Tribe; and others. Approximately fifteen individuals and group representatives made presentations in support of or in opposition to the proposed action. The plaintiff's demand for more—in particular, for an opportunity to submit written comments—lacks support in precedent and manifest fairness. As above, the defendants' fourth and fifth arguments bolster this result.

IV. The court having determined that the land was properly taken in trust, there remain the two issues of whether the land is subject to the plaintiff's criminal jurisdiction and whether it is subject to the plaintiff's land use regulations.

(a) Criminal Jurisdiction. Chapter 53 of Title 18, United States Code, provides for, *inter alia*, federal criminal jurisdiction over lands that are "Indian country" within the meaning of 18 U.S.C. § 1151.[10] Here the

---

9. *Cf. Nat'l Equipment Rental Ltd. v. Szukhent*, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) (upholding service of process, even though the service was upon a contractually designated agent unknown to the respondent, in view of the fact that the agent *actually* notified the respondent.

10. This court need not address the precise extent of the criminal jurisdiction conferred by Chapter 53.

plaintiff contends that even if the land was properly taken in trust, that land does not fall within the scope of this statute. Section 1151(b), the subsection relevant to the case at hand, defines "Indian country" as "all *dependent Indian communities* within the borders of the United States...." (Emphasis supplied.)

■ All parties agree that the term "dependent Indian community" derives from the cases of *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1937), and *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). Hence, in order to determine the proper scope of section 1151(b) it is proper to turn to these cases, as explicated by two subsequent rulings, *United States v. Martine*, 442 F.2d 1022 (10th Cir. 1971), and *United States v. Mound*, 6 ILR F–159 (D.S.D.1979).

In *United States v. Martine* the court stated,

> The *Sandoval* case indicates that the proper approach to [applying section 1151(b) is to consider] the nature of the area in question, the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area.

442 F.2d at 1023. The opinion in *United States v. Mound* sets forth a similar approach.[11] To say the least, analysis of these factors calls for an extensive factual inquiry, and the court is persuaded that the necessity for such an inquiry precludes summary judgment for either side at this time and under these circumstances. The Secretary emphasizes that at present the disputed parcel is uninhabited, and the planned housing project has not been built. Therefore the court cannot possibly evaluate such matters as the relationship of the inhabit-

ants of the area with the Tribe or the type of organization that will eventually be established on the land. Clearly, this case is not ripe, and any ruling by the court would be purely advisory.

■ (b) Land Use Regulations. Conceding that section 465, if applicable, precludes state or local taxation of the land, Plaintiff's Brief 53, the plaintiff argues that "its powers regarding land use regulation over the 76-acre parcel have in no way been diminished by the tax exemption contained in § 465." *Id.* As with the issue of criminal jurisdiction, the defendants argue that this issue is not justiciable, both because there has been no violation of or attempt to enforce any of the plaintiff's land use laws and because potential disputes along these lines were resolved by the consent degree in *United States v. City of Sault Ste. Marie.* It appears, however, that although the consent agreement resolves potential disputes with respect to some such laws, the plaintiff routinely enforces a variety of additional construction and maintenance codes that are not addressed at all in the agreement. Moreover, these laws are comprehensive in the time and geographic scope of their application, so it is implausible to say that because there has as yet been no enforcement action they are not currently in effect. Hence, there is a justiciable controversy regarding these laws.

■ It has long been the position of the Department of Interior that municipal land use laws may not be enforced on tribal trust lands except as permitted by the Secretary. In furtherance of this position the Secretary promulgated 25 C.F.R. § 1.4, which restricts state regulatory power over all land held in trust by the federal government.[12] The plaintiff concedes that if sec-

11. Citing *Sandoval, McGowan,* and *Martine,* the court in *Mound* expressly addressed the following issues: "Title to the Land," "Purpose of the Community," "Relationship of the Community to the Tribe," "Relationship of the Community to the Federal Government," "Practice of State Government Agencies Toward the Community," and "Composition of the Community." 60 ILR F–160.

12. Section 1.4 provides:

> (a) Except as provided in paragraph (b) of this section, none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property ... shall be

tion 1.4 is valid, it would apply to the tract in issue. Plaintiff's Brief 54.

The plaintiff challenges the validity of section 1.4, contending, first, that its promulgation was not authorized by any statute and, second, that it is inconsistent with the Supreme Court's ruling in *Mescalero Apache Tribe v. Jones*, 411 U.S. 195, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1975). Neither argument is persuasive.

In support of the former point the plaintiff cites two professional works [13] and two district court decisions, *Norvell v. Sangre de Cristo Development Co., Inc.*, 372 F.Supp. 348 (D.N.M.1974), *rev'd on other grounds*, 519 F.2d 370 (10th Cir. 1975); *Rincon Band of Mission Indians v. County of San Diego*, 324 F.Supp. 371 (S.D.Cal.1971), *rev'd on other grounds*, 495 F.2d 1 (9th Cir. 1974), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). As the defendants point out, however, neither district court ruling survived on appeal,[14] and the arguments in those rulings and both professional works were expressly considered and rejected by the Ninth Circuit in *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 664–68 (9th Cir. 1975). In support of section 1.4 the *Santa Rosa Band* opinion commented, "We think 25 U.S.C. § 465, which authorizes the Secretary to purchase land for the 'purpose of providing land for Indians' and to take the title to such lands in trust, when read against the history of Federal policy governing use and control of Indian trust property, is sufficient to sustain the regulation...." *Id.* at 665–66.

As it must in order to prevail, the plaintiff attacks *Santa Rosa Band* directly, arguing in particular that section 465's express exemption of tribal trust land from state and local taxation yields a negative implication that no additional exemption—for example, exemption from land use regulations—was intended by Congress. This court is more persuaded, however, by the Ninth Circuit's response to this very argument:

> Section 465 explicitly exempted the lands acquired from state taxation. Rather than reading the omission of a provision exempting the lands from state regulation as evidencing a congressional intent to allow state regulation, we read the omission as indicating that Congress simply took it for granted that the states were without such power, and that an express provision was unnecessary; i.e., that the exemption was implicit in the grant of trust lands under existing legal principles.

532 F.2d at 666 n.17.

The plaintiff also argues that the *Santa Rosa Band* court failed to consider the impact of *Mescalero Apache Tribe*, which, according to the plaintiff, fatally undermines the defendants' position. In *Mescalero Apache Tribe*, however, what the Court upheld—over challenges based on the section 465 exemption from state and local taxation—was taxation of the income of a ski resort operated on land outside the boundaries of the Indian reservation. The Court emphasized that this taxed activity took place outside the reservation and that the tax was imposed not on the land itself but on income from the land. Moreover, it upheld a section 465-based claim of immunity from the state's use tax on permanent improvements on the land.

---

applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe ... that is held in trust by the United States....

(b) The Secretary of the Interior ... may in specific cases or in specific geographic areas adopt or make applicable to Indian lands all or any part of such laws, ordinances, codes, resolutions, rules or other regulations referred to in paragraph (a) ... as he shall determine to be in the best interest of the Indian owner or owners in achieving the highest and best use of such property.

**13.** Price, *Law and the American Indian* (1973); Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 U.C.L.A.L.Rev. 535, 586 n.229 (1975).

**14.** These cases constitute weak authority for reasons other than their failure to survive on appeal. So far as *Rincon Band* differs in its holding from *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), *see* text *infra*, it is clearly overruled. And *Norvell* involved state authority over non-Indian lessees of Indian-owned land.

For these reasons the court is persuaded that the plaintiff's challenge to section 1.4 must fail, and its land use regulations may not be applied to the 76-acre tract except as permitted by the Secretary.

An appropriate Judgment accompanies this Memorandum Opinion.

### On Motion To Reconsider

This matter comes before the court on plaintiff's motion for summary judgment. Plaintiff asks the court to reconsider its ruling on the issues of procedural due process. *See* Memorandum Opinion filed August 29, 1980 at 162–164. For the reasons stated below, the court's previous opinion is modified to state that plaintiff is not a person within the meaning of the Fifth Amendment and that plaintiff's tax and regulatory powers are not property interests protected by the Fifth Amendment.

This court's August 29, 1980 opinion reasons that the plaintiff was entitled to due process because it is a person within the meaning of the Fifth Amendment. Two cases are cited in support of that proposition. Principal reliance is placed on *City of Santa Clara v. Andrus*, 572 F.2d 660, 675 (9th Cir. 1978). In that case appellant argued that a city is not a "person" entitled to due process protection under the Fifth Amendment. The court said it was "by no means convinced that [appellant's] argument is correct," but it did not decide the issue, it only assumed it for purpose of the argument before it.

The second case this court relied upon is *Township of River Vale v. Town of Orangetown*, 403 F.2d 684, 686 (2d Cir. 1968). That case held a municipal corporation is a person within the meaning of the Fourteenth, not the Fifth Amendment. Moreover, that aspect of the case may be overruled by a later Second Circuit case, *Aguayo v. Richardson*, 473 F.2d 1090, 1100–1101 (1973).

■ In *South Carolina v. Katzenbach*, 383 U.S. 301, 323–4, 86 S.Ct. 803, 815–16, 15 L.Ed.2d 769 (1966), the Court said:

Some of these contentions may be dismissed at the outset. The word "person" in the context of the Due Process Clause of the Fifth Amendment cannot by any reasonable mode of interpretation, be expanded to encompass the *States* of the Union, and to our knowledge this has never been done by any court. (emphasis added.)

It is well settled that a municipality is a creature of the state, created by the state legislature for the exercise of such powers as the state sees fit, *e.g., City of Trenton v. State of New Jersey*, 262 U.S. 182, 185–90, 43 S.Ct. 534, 536–37, 67 L.Ed. 937 (1923), and plaintiff concedes as much. *See also Tally v. City of Detroit*, 54 Mich.App. 328, 220 N.W.2d 778 (1974) (municipality is an arm of the state under Michigan law). It is difficult to imagine how a municipality can be a "person" under the Fifth Amendment if its progenitor, the state, cannot be. Plaintiff argues that a municipal corporation has, like a private corporation, a life independent from the state during its existence. It points out that the similarity between municipal corporations and private corporations was recently noted by the Supreme Court when it stated, "by 1871 municipalities—like private corporations—were treated as natural persons for virtually all purposes of constitutional and statutory analysis." *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). However, it is equally true that municipalities and states are treated the same for virtually all legal purposes. Although both private and municipal corporations are "persons" for most purposes, the distinction between the two is that a municipality operates as an agent or subdivision of the state, while a private corporation functions totally apart from the state. Thus a state cannot confer a constitutional status upon a municipality which the state does not itself enjoy, since the municipality performs the same function as the state.

■ Judge Friendly urged the same result in his opinion in *Aguayo v. Richardson*, 473 F.2d 1090, 1101 (1973). Although stating that a city might be a "person" under the Fifth Amendment for purposes of a claim of discriminatory treatment, he said

"a city would clearly lack standing to raise due process claims (e.g. lack of fair hearing) relating to its citizens." There is no practical difference between saying a party is not entitled to the protection of due process and that the party has no standing to assert due process claims, and Judge Friendly's opinion affirms the district court holding that the City of New York lacked standing to assert constitutional claims against federal defendants. Accordingly, plaintiff in this case cannot assert due process claims on the basis that a city is a person within the meaning of the Fifth Amendment.

■ In addition, plaintiff's taxation and regulatory powers are not compensable property rights, but are only an expectation. *United States v. 6.321 Acres of Land,* 479 F.2d 404, 406. A mere expectation does not rise to the level of a "legitimate claim of entitlement," *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), which would entitle plaintiff to Fifth Amendment protection.