# Bonneville Power Administration's Claim for Reimbursement in Connection with Land Transfer

Under the Federal Property and Administrative Services Act of 1949, the Bonneville Power Administration is entitled to be reimbursed the fair value of certain property that it transferred to the Secretary of the Interior for the use and benefit of the Puyallup Indian Tribe, without regard to whether said property is located within the Puyallup Indian Reservation.

Under the Federal Property and Administrative Services Act of 1949, fair value reimbursement to the transferor agency by the acquiring agency is mandatory in all cases where the property was acquired with funds from a revolving fund, 40 U.S.C. §§ 483(a)(1), 485(c). The General Services Administration has no discretion to waive such a repayment obligation by the acquiring agency, even where, as is arguably the case here, the acquiring agency is under an independent statutory obligation to acquire the land.

March 2, 1982

## MEMORANDUM OPINION FOR THE ASSISTANT GENERAL COUNSEL, DEPARTMENT OF ENERGY

This responds to your request for our opinion on a matter in dispute between the Bonneville Power Administration (Bonneville) and the General Services Administration (GSA) relating to Bonneville's claim for reimbursement in connection with its transfer to the Secretary of the Interior of certain real property under the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471–75 (1976 & Supp. IV 1980) (the Act).[1] At issue is whether Bonneville is entitled to be reimbursed the fair value of the property which the Secretary of the Interior has taken in trust for the Puyallup Tribe of Indians. We conclude that it is so entitled.

According to the information you provided us, the property in question consists of 1.34 acres of land in Pierce County, Washington, purchased some years ago for the United States by Bonneville from private parties with funds appropriated from the Treasury. The Treasury has since been reimbursed the purchase price from revenues generated by Bonneville's sale of electric power. As a practical matter, then, the land has been paid for by Bonneville's customers. Recently, Bonneville determined that it no longer had any need for the property,

---

[1] As you know, we solicited the views of both the Department of the Interior and the Department of Energy on the questions presented by Bonneville. The former agency was in substantial agreement with GSA's interpretation of the Act. We also received an unsolicited submission from the attorney for the Puyallup Nation of Indians discussing a second issue raised by Bonneville—the continuing existence of the Puyallup Indian Reservation within whose boundaries the property in question is purported to be located. See note 4, infra.

and so reported to GSA.[2] GSA then sought to ascertain, as required under § 483(a)(1) of the Act,[3] whether any other federal entity was interested in acquiring the property. Subsequently, at the request of the Puyallup Indian Tribe, the Bureau of Indian Affairs of the Department of the Interior certified to GSA that the property was located within the reservation boundaries of the Puyallup Tribe, and requested that the land be transferred to the Secretary of the Interior to be held in trust by him for the benefit and use of the tribe, as required by § 483(a)(2) of the Act.

Bonneville takes the position that under §§ 483(a)(1) and 485(c) of the Act it is entitled to be reimbursed the fair value of the property. GSA does not dispute that Bonneville would ordinarily be entitled to fair value reimbursement by an agency acquiring the property under the above-mentioned provisions of the Act. Rather, GSA contends that no reimbursement is required because the land is located within an Indian reservation, is therefore subject to the terms of § 483(a)(2), and consequently its transfer generates no proceeds from which reimbursement would be possible. The Department of the Interior appears to be in essential agreement with GSA on this point of statutory construction.[4]

## I.

Section 483(a)(1) of the Act provides for the transfer among federal agencies of "excess" property,[5] and reads in pertinent part as follows:

> Subject to the provisions of paragraph (2) of this subsection, in order to minimize expenditures for property, the Administrator

---

[2] Under 16 U.S C § 832a(e) (1976) Bonneville would appear to have its own authority, independent of GSA, to sell or otherwise dispose of real property owned by it, provided that it obtains the prior approval of the President for the particular transaction It is not clear to us why Bonneville chose in this case to dispose of the property through GSA, and thereby necessarily in accordance with the procedures mandated by the Act, rather than simply sell it on the open market. We note, however, that the decision to dispose of the property through GSA facilitates its transfer into trust for the Puyallup Tribe.

[3] Relevant sections of the Act will be identified in this opinion by citation to Title 40 of the United States Code. Thus § 202(a)(1) of the Act will be cited as § 483(a)(1), § 204(c) as § 485(c), etc

[4] Bonneville argues in the alternative that the parcel of excess land in question is not currently located "within" an Indian reservation, and that its transfer is therefore not governed by § 483(a)(2) In support of this position, Bonneville cites several recent Supreme Court cases which, in its view, cast doubt upon the continued existence of the Puyallup Reservation GSA defers to the determination of the Interior Department on the question of the location of the property within an Indian reservation, and its concomitant eligibility for transfer pursuant to § 483(a)(2) The Department of the Interior urges that the holding of the Court of Appeals in *United States* v *State of Washington*, 496 F 2d 620 (9th Cir. 1974), *cert. denied*, 419 U S 1032 (1975) be considered conclusive of the issue of the continued existence of the Puyallup Reservation.

We agree with the Department of the Interior that it would be inappropriate, in light of the United States' fiduciary obligations as trustee for the Indians, to reopen the question of the reservation's status in this context We are mindful, in this regard, of the government's longstanding litigating position on the issue *See, e.g, City of Tacoma* v *Andrus*, 457 F Supp. 342 (D D.C. 1978) (Secretary of Interior acted within his power under 25 U.S.C. § 465 (1976) in acquiring trust lands within historic boundaries of Puyallup Reservation) In any event, because our conclusion with respect to Bonneville's entitlement to reimbursement under the Act does not depend upon the location of the property, we need not address the considerations raised by Bonneville with respect to the continued existence of the reservation

[5] "Excess property" is defined in § 472(e) of the Act of "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof." It is distinguished from "surplus property," which is defined in § 472(g) as "any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator [of GSA]"

173

shall prescribe policies and methods to promote the maximum utilization of excess property by executive agencies, and he shall provide for the transfer of excess property among Federal agencies and to the organizations specified in section 756(f) of this title. The Administrator, with the approval of the Director of the Office of Management and Budget, shall prescribe the extent of reimbursement for such transfers of excess property: *Provided, That reimbursement shall be required of the fair value, as determined by the Administrator, of any excess property transferred whenever net proceeds are requested pursuant to section 485(c) of this title* or whenever either the transferor or the transferee agency (or the organizational unit affected) is subject to the Government Corporation Control Act (59 Stat. 597; 31 U.S.C. 841) or is an organization specified in section 756(f) of this title . . . .

(Emphasis added.) By the terms of this section, the Administrator of General Services has some discretion in determining the extent to which an agency accepting transfer of excess property must "reimburse" the Treasury for its acquisition. However, "fair value" reimbursement "shall be required" from an acquiring agency "whenever net proceeds are requested pursuant to section 485(c) of this title." This latter section deals with the situation in which excess property was originally acquired by the transferor agency "by the use of funds either not appropriated from the general fund of the Treasury or appropriated therefrom but by law reimbursable from assessment, tax, or other revenue or receipts. . . ." In such a case, and upon the request of the transferor agency, the proceeds of the transfer "shall be credited to the reimbursable fund or appropriation or paid to the Federal agency which determined such property to be excess. . . ." In other words, "fair value" reimbursement to the transferor agency by the acquiring agency is mandatory under § 483(a)(1) whenever the property was acquired by the transferor agency with funds from a so-called "revolving fund."[6]

---

[6] As originally enacted, § 483 of the Act required fair value reimbursement by the acquiring agency in *all* excess property transfers *See* § 202(e) of the Act of June 30, 1949, ch 288, 63 Stat. 385 Amendments to the Act in 1952 gave the Administrator of General Services discretion to waive this reimbursement requirement in all but a few situations. *See* Act of July 12, 1952, ch 703, 66 Stat. 593 The Senate Report explained the need for the amendments as follows

The purpose of this provision of the bill . . is to permit better utilization of excess property by other Federal agencies which have need for such property. Experience has clearly demonstrated that a considerable amount of excess property which has been reported to the GSA for redistribution to other Federal agencies cannot under existing authority be transferred to the needing agencies, since reimbursement is required under the "fair value" provision of section 202 of the Federal Property and Administrative Services Act of 1949, as amended. The *needing agencies contend that they have no funds available for reimbursing the owning agency, and GSA does not have authority to transfer without reimbursement,* and as a result the best utilization of excess property is not attained. This amendment to the act would liberalize the effect of the statute and at the same time provide a more flexible method for transfer so that greater utilization of excess property could be attained, while at the same time retaining existing exceptions specifically authorized by law.

S. Rep No 2075, 82d Cong., 2d Sess 3 (1952) (emphasis supplied). One of the "existing exceptions" referred to in the above passage is the situation in which "net proceeds are requested pursuant to § 485[c] "

The regulations implementing GSA's responsibilities under § 483(a)(1) are found in Subpart 101-47.2 of Title 41 of the Code of Federal Regulations. Reimbursement for transfers of excess real property is prescribed in 41 C.F.R. 101-47.203-7(f). Subsection (f)(1) mandates fair value reimbursement where the transferor agency requests the "net proceeds" of a transfer under § 485(c) of the Act; subsection (f)(2) prescribes in some detail procedures governing reimbursement "in all other transfers of excess real property." Briefly, GSA may or may not require reimbursement from an acquiring agency under (f)(2), depending upon whether the agency has available appropriated funds to spend on the acquisition, or whether Congress has specifically authorized the transfer without reimbursement.[7] In accordance with the mandate of the statute, the regulations embody no analogous waiver authority where § 485(c) property is involved.

## II.

Bonneville contends, and GSA does not dispute, that the property in question here falls within the scope of § 485(c). Although initially the funds used to purchase the property were appropriated from the Treasury, the Treasury is being reimbursed through revenues generated from the sale and transmission of electric energy generated at the Bonneville project. See 16 U.S.C. § 832j. Bonneville would therefore appear to be entitled to fair value reimbursement from the agency to which its excess property is transferred, both under § 483(a)(1) of the Act and under GSA's implementing regulations.

In this case, however, GSA argues that under 1975 amendments to the Act dealing with excess property located within Indian reservations, Bonneville is not entitled to reimbursement. These amendments make § 483(a)(1) expressly "subject to" a new § 483(a)(2), which requires GSA to transfer any excess property located within an Indian reservation to the Secretary of the Interior to be held in trust for the tribe. See Act of Jan. 2, 1975, Pub. L. No. 93-599, 88 Stat. 1954. The subsection reads in pertinent part as follows:

> The Administrator shall prescribe such procedures as may be necessary in order *to transfer without compensation to the Secretary of the Interior* excess real property located within the reservation of any group, band, or tribe of Indians which is recognized as eligible for services by the Bureau of Indian Affairs. Such excess real property shall be held in trust by the Secretary for the benefit and use of the group, band, or tribe of Indians, within whose reservation such excess real property is located. . . . (Emphasis added.)

---

[7] Examples of situations in which Congress has specifically authorized the transfer of property without reimbursement are found in 16 U.S C § 667b (transfer of real property for wildlife conservation purposes to state agencies or Department of the Interior), 50 U S.C. App. § 1622(g) (conveyance of real property to state or local government for public airports); 40 U S.C. § 484(k)(3) (conveyance of real property to state or local governments for use as historic monument). However, as we read GSA's regulations, the reimbursement obligation may be excused *only* in situations where § 485(c) does not apply Thus the general obligation to reimburse a revolving fund under (f)(1) will always prevail over any defense to a reimbursement obligation set out in (f)(2).

175

GSA's position, with which Interior is in essential agreement, is based on a reading of the above provision in which the phrase "without compensation" modifies the word "transfer." The transaction contemplated by (a)(2) is thus characterized as a "transfer without compensation." From this characterization GSA argues that a § 483(a)(2) transfer generates no proceeds which could be credited to Bonneville's revolving fund.

If GSA's reading of the language of subsection (a)(2) is correct, the fair value reimbursement requirement contained in subsection (a)(1) will never be realized in a transfer of land located within an Indian reservation. Thus, subsection (a)(2) would qualify subsection (a)(1) in not one but two respects: it would limit the GSA Administrator's discretion under (a)(1) with respect to which agency is entitled to the excess property, and also impliedly repeal that section's fair value reimbursement requirement for self-financing agencies like Bonneville. We hesitate to give the provision such a broad effect without the clearest expression of congressional intent, particularly since in certain circumstances it could raise constitutional issues. *See* note 10, *infra*. We look, therefore, to a possible alternative reading of the language of subsection (a)(2): a transfer governed by this section is to be effected "without compensation to the Secretary of the Interior." Certainly, this is a reasonable alternative reading of somewhat ambiguous phraseology—phraseology whose ambiguity is compounded by the use of the word "compensation" instead of the term generally used in this statute, "reimbursement."[8]

Because the language which Congress chose admits of more than one reasonable construction, we turn to the legislative history to ascertain what relationship Congress intended the new section to have to other parts of the Act, and in particular to § 483(a)(1) itself.[9] There we find strong support for the alternative reading we have suggested, and none for GSA's.

## III.

Public Law No. 93-599 was enacted in 1975 principally to curtail the discretion which both the Administrator of General Services and the Secretary of the Interior then enjoyed under the Act in connection with the disposition of excess property located within an Indian reservation. Under the law as it then existed, a tribe's ability to benefit from the use of excess federal property on its reservation was entirely dependent upon the willingness of the Secretary of the Interior to

---

[8] Had Congress intended to preclude an owning agency's being reimbursed in any circumstances by the Secretary of the Interior under § 483(a)(2), it might have stated clearly that excess property located within an Indian reservation should be "transferred to the Secretary of the Interior without compensation *to the owning agency.*" Alternatively, the statute could have referred to "transfer without reimbursement to the transferor" which would have been consistent with the language and structure of (a)(2). While speculation regarding what Congress might have said is not particularly useful, its departure from the more obvious choices leads one to an inquiry into the legislative history to see if there is any explanation for the words it did select.

[9] References to the legislative history may be appropriate even where a statute's meaning appears plain on its face, particularly where apparently contradictory directives are given by more than one applicable provision of law. *See Watt* v. *Alaska.* 451 U.S. 259 (1981). *See also Train* v. *Colorado Public Interest Research Group, Inc.*, 426 U S 1, 10 (1976)

176

apply to GSA for its transfer, and GSA's willingness to choose Interior over some other agency interested in acquiring the land. The 1975 amendments to the Act were intended to make mandatory GSA's transfer of excess property located within a reservation to the Secretary of the Interior, to be held in trust "for such use as the Indian tribe located on the reservation believes best." *See* H.R. Rep. No. 1339, 93d Cong., 2d Sess. 4 (1974) (House Report). Neither the terms of the statute nor its legislative history suggest that Congress intended there to be any exceptions to this requirement, or that any discretion was to remain in either GSA or the Secretary once the land was determined to be located "within [a] reservation."

As originally introduced in the House, and reported out of Committee in the Senate, the legislation authorized the Secretary of the Interior under certain limited circumstances to require reimbursement from an Indian tribe when excess property located within a reservation was transferred to Interior in trust for the tribe. *See* House Report at 2; *Disposal of Excess Property Located within Indian Reservations: Hearing on H.R. 8958 Before a Subcomm. of the House Comm. on Government Operations,* 93d Cong., 2d Sess. 3 (1974). Specifically, H.R. 8958, 93d Cong., 1st Sess. (1973) authorized the Secretary to require reimbursement "in the event that the group, band, or tribe of Indians receiving excess property under this section was compensated for such real property when title was acquired by the United States." This limited authority was stricken by the House Committee, however, with the following comments:

> Amendment two provides that excess property shall be trans-
> ferred to the Interior Department *for the use [sic] by Indian tribes*
> *"without compensation."* Since the land in question will remain
> in Federal hands, *it does not seem appropriate to exact a charge*
> *for its use from the tribes.* The fact that many tribes have only
> limited financial resources also contributed to the committee's
> belief that they should not be charged for land located within their
> own reservations. In some instances, at least, the exactment of a
> charge would prevent a tribe without adequate resources from
> obtaining needed property. This would clearly defeat efforts to
> institute self-sufficiency in Indian tribes.

House Report at 2 (emphasis added).

As this passage makes clear, the addition of the phrase "without compensation" in the first sentence of (a)(2) was intended to do no more than ensure that Indian tribes were not "charged for land, located within their own reservation," and preclude the Secretary's exacting a charge from the tribes in connection with his acquisition of the land for their benefit. There is no suggestion that the phrase in (a)(2) was intended to change existing law on reimbursement in connection with interagency transfers under (a)(1), or that the terms of a transfer transaction under (a)(2) were not intended to be governed, at least as between the owning and acquiring federal agencies, by the preceding section. And, as we have noted, the

177

existing law would have required an agency acquiring excess § 485(c) property to reimburse the owning agency its fair value.

Moreover, the very use of the term "reimbursement" to describe the Secretary's proposed authority to levy on the Indians in the original version of the bill suggests that its drafters anticipated that the Secretary would at least in some cases have to pay something to acquire the property. This may indicate that Congress contemplated that the Secretary might have to expend funds in connection with accepting transfers under § 483(a)(2).[10]

We conclude, therefore, that Bonneville's entitlement to reimbursement under §§ 483(a)(1) and 485(c) of the Act is not affected by the passage of the 1975 law. In reaching this conclusion we are mindful of the basic canon of statutory interpretation that a statute "ought to be so construed as to make it a consistent whole," and that "the construction that produces the greatest harmony and the least inconsistency is that which ought to prevail." 2A C. Sands, Sutherland's Statutory Construction § 46.05 at 57 (4th ed. 1973), citing *Attorney General* v. *Sillem*, 159 Eng. Rep. 178 (1863). *See also Watt* v. *Alaska*, 451 U.S. at 267 ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose.").

The question of the Interior Department's authority to expend appropriated funds on the acquisition of the excess property in question for the use and benefit of the Puyallup Tribe is not before us, although we note as possibly relevant in this regard the general authority to expend funds for the benefit of the Indians set forth in 25 U.S.C. § 13 and, more particularly, the authority to purchase land for the use and benefit of the Indians contained in 25 U.S.C. § 465. In addition, because we believe that § 483(a)(2) of the Act must be construed to leave Interior no discretion to refuse to accept transfer of excess property located within a reservation simply because the transferring agency must under § 483(a)(1) be reimbursed for it, § 483(a)(2) itself may constitute an additional source of authority to expend funds otherwise available for that purpose.[11] *Cf. New York Airways, Inc.* v. *United States*, 369 F.2d 743, 748 (Ct. Cl. 1966) (Congress' failure to appropriate funds to meet an agency's statutory obligation does not defeat that obligation). It may be, of course, that Interior simply does not have sufficient funds to spare from its general appropriation, consistent with fulfilling the other obligations which must be funded from this source. In this event, either

---

[10] There is no indication in the legislative history of the 1975 amendments that Congress considered the situation involving lands paid for not with public funds but with funds generated from assessments of a particular group of citizens. Statements in the legislative history suggest that it did not. *See, e.g.*, House Report at 2 ("the land in question will remain in Federal hands"). This does not, however, cast doubt on our conclusion with respect to the purpose of the "without compensation" language in (a)(2). Indeed, it reinforces it. One may well ask whether Congress, if asked, would have thought it fair or appropriate that land in effect paid for by one group of citizens, here Bonneville's customers, could be transferred to a federal agency without compensation

[11] It is a well settled principle of law that a lump sum appropriated for an agency's general programs and activities may be used by the agency for any otherwise authorized purpose. *See, e.g.*, *In re Newport News Shipbuilding and Drydock Co.*, 55 Comp. Gen. 812, 819–21 (1976). *See also City of Los Angeles* v. *Adams*, 556 F.2d 40, 49–50 (D C Cir. 1977) (an agency head's discretion to reprogram funds among authorized programs under a lump sum appropriation is limited only if a specific statutory directive requires the expenditure or distribution of funds in a particular manner). Thus Interior is not legally obliged to seek a new appropriation to reimburse Bonneville for the land, as long as there are funds available from its unrestricted general appropriation which could be allocated or reprogrammed for this purpose.

Interior or Bonneville could seek an additional supplemental appropriation for that specific purpose.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*