Donald L. CARCIERI, in his capacity as Governor of the State of Rhode Island; State of Rhode Island and Providence Plantations, a sovereign state of the United States of America; and Town of Charlestown, Rhode Island,

v.

Gale A. NORTON, in her capacity as Secretary of the Department of the Interior, United States of America; and Franklin Keel, in his capacity as Eastern Area Director of the Bureau of Indian Affairs, within the Department of the Interior, United States of America.

C.A. No. 00–375ML.

United States District Court,
D. Rhode Island.

Sept. 29, 2003.

Neil F.X. Kelly, Attorney General's Office, Providence, RI, for State of R.I.

Bruce N. Goodsell, Westerly, RI, Peter D. Ruggiero, Warwick, RI, Joseph S. Larisa, Jr., Providence, RI, for Town of Charlestown.

Anthony C. DiGioia, Asst. U.S. Attorney's Office, Providence, RI, Charles Jakosa, U.S. Dept. of Justice, Environment & Natural Resources Division, Washington, DC, Judith Rabinowitz, U.S. Dept. of Justice, Environment & Natural Resources Division, San Francisco, CA, for defendant.

John F. Killoy, Wakefield, RI, for Narragansett Indians.

## MEMORANDUM AND ORDER

LISI, District Judge.

This is an action brought pursuant to 5 U.S.C. § 702, the Administrative Procedure Act ("APA"). The plaintiffs, Donald L. Carcieri [1], in his capacity as Governor of the State of Rhode Island, the State of Rhode Island ("the state"), and the Town of Charlestown ("the town") challenge a final determination of the Secretary of the Department of the Interior ("the secretary") to accept a 31–acre parcel of land ("the parcel") located in Charlestown, Rhode Island into trust for the benefit of the Narragansett Indian Tribe of Rhode Island ("the Narragansetts" or "the tribe").[2] Presently before the Court for determination are the parties' cross-motions for summary judgment. For the reasons that follow: (1) the plaintiffs' motion is denied; and (2) the motion of the defendants, Gale Norton in her capacity as Secretary of the United States Department of the Interior, and Franklin Keel in his capacity as Eastern Area Director of the Department of the Interior, Bureau of Indian Affairs ("the BIA" or "the bureau") is granted.

### I. Background.

In 1975, the Narragansetts, asserting claims of aboriginal title to approximately

---

1. By stipulation, Donald L. Carcieri, has been substituted for the former governor, Lincoln Almond.

2. The parcel is described as Assessor's Plat 117, Lot 119. *Town of Charlestown v. E. Area Dir. Bureau of Indian Affairs,* IBIA 98–88–A and 98–89–A, 35 IBIA 93 (2000).

3,200 acres of land located in Charlestown, instituted two lawsuits in this Court.[3] The parcel was part of the realty to which the tribe asserted aboriginal right.

On February 28, 1978, the parties to the then-pending federal litigation entered into a Joint Memorandum of Understanding ("JMOU") that was intended to achieve settlement of both actions. The JMOU provided for the acquisition of approximately 900 acres of state-held land and approximately 900 acres of privately-held land[4] (collectively, "the settlement lands"). The settlement lands were to be held in trust for the benefit of the tribe by a state-chartered entity, the Narragansett Indian Land Management Corporation, which was created for such purposes. JMOU ¶¶ 1, 8. The parcel was not part of the settlement lands.

In exchange, the Narragansetts agreed to the enactment of federal legislation "that eliminates all Indian claims of any kind, whether possessory, monetary or otherwise, involving land in Rhode Island, and effectively clears the titles of landowners in Rhode Island of any such claim." Id. ¶ 6. Subsequently, both Congress and the Rhode Island General Assembly enacted implementing legislation. Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701–1716 (2000) (effective September 30, 1978) ("the Settlement Act"); R.I. Gen. Laws §§ 37–18–1 to 37–18–15 (1997) (effective 1979). The Settlement Act extinguished all of the Narragansetts'

claims of aboriginal right to lands. 25 U.S.C. § 1705(a)(3).

In 1983, the Narragansetts obtained federal recognition as an Indian tribe. See 48 Fed.Reg. 6177–78 (Feb. 2, 1983). Thereafter, the Narragansett Indian Land Management Corporation was dissolved and the lands that had been held by the corporation on the Narragansetts' behalf were transferred to the tribe. R.I. Gen. Laws §§ 37–18–12, 37–18–13, 37–18–14. In 1988, following application by the tribe, the settlement lands were accepted into trust by the secretary for the Narragansetts' benefit pursuant to Section 5 of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 465 (2000).

In 1991, the 31–acre parcel that is the subject of the instant litigation was purchased from a private developer by the Narragansett Indian Wetuomuck Housing Authority ("the WHA") for the purpose of constructing a housing complex. *Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co.*, 89 F.3d 908, 911 (1st Cir. 1996). The parcel is adjacent to the settlement lands but separated from them by a town road. *Id.*

The WHA was established by the Narragansetts and was recognized by the United States Department of Housing and Urban Development ("HUD") as an Indian housing authority. *Id.* HUD provided the financing for the purchase of the parcel and the construction of the housing units on the site. *Id.*[5]

---

**3.** *Narragansett Tribe of Indians v. S.R.I. Land Dev. Corp.*, 418 F.Supp. 798 (D.R.I.); *Narragansett Tribe of Indians v. R.I. Dir. of Envtl. Mgmt.*, C.A. No. 75–0005 (D.R.I.).

**4.** Federal funds, in the amount of $3,500,000.00, were appropriated for the purpose of acquiring the privately-held settlement lands. 25 U.S.C. §§ 1702(d), 1703, 1704, 1707, 1710.

**5.** Initially, funding was provided pursuant to the Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-ee, repealed by Pub.L. 104–330 (1996). The Native American Housing Assistance and Self–Determination Act of 1996, 25 U.S.C. §§ 4101–4243 (2000) (enacted by Pub.L. 104–330) provides the present funding mechanism.

In 1992, the WHA conveyed the parcel to the tribe with a deed restriction that the property be placed in trust with the federal government for the express purpose of providing housing for tribal members. *Id.;* Defs.' Statement Undisputed Facts, ¶ 17. The tribe leased the parcel back to the WHA with the approval of the BIA. 89 F.3d at 911; Defs.' Statement Undisputed Facts, ¶ 17.

The WHA began construction of the housing development without obtaining, *inter alia,* a building permit from the town or the state's approval of the individual sewage disposal systems serving the project. 89 F.3d at 912. The state and the town sought injunctive relief prohibiting the Narragansetts and the WHA from constructing a housing complex without obtaining various permits and approvals that were required by state law and local ordinances. *See Narragansett Indian Tribe v. Narragansett Elec. Co.,* 878 F.Supp. 349 (D.R.I.1995), *rev'd in part, aff'd in part,* 89 F.3d 908 (1st Cir.1996). The WHA and the tribe contended that such permits and approvals were not required because the development was located on tribal land and state jurisdiction was precluded by the doctrine of Indian sovereignty. 878 F.Supp. at 354.

Resolution of the dispute required, *inter alia,* a determination of whether the parcel fell within the definition of "Indian country" set forth in 18 U.S.C. § 1151. *Id.* at 355. Congress has defined "Indian country" to include: "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . (b) all dependent Indian communities within the borders of the United Sates . . . and (c) all Indian allotments, the Indian titles to which have not been extinguished . . . " 18 U.S.C. § 1151 (2000).

The district court determined that the housing site was a "dependent Indian community" within the meaning of § 1151(b). 878 F.Supp. at 356–57. After addressing the applicability in "Indian country" of the several state and local regulations at issue, the court permanently enjoined the WHA, the tribe, their officers, members, agents and those acting in concert with them from: (1) occupying or permitting occupation of any housing units on the site until all applicable requirements of Rhode Island's coastal resources management program had been satisfied; and (2) interfering with the drainage easement previously conveyed to the town. *Id.* at 366. The court denied injunctive relief with regard to the tribe's and the WHA's failure to comply with the requirements of any state regulations promulgated pursuant to the Historic Preservation Act, the Clean Water Act, the Safe Water Drinking Act, and those provisions of the state building code and the town zoning ordinance that were at issue in the case. *Id.*

On appeal, the First Circuit concluded that the parcel was not a "dependent Indian community" and thus not "Indian country" within the meaning of 18 U.S.C. § 1151(b). 89 F.3d at 911. Accordingly, the court of appeals reversed the district court's decision to the extent that the trial court had denied injunctive relief and the trial court was directed to enter an order granting the injunction.[6] *Id.* at 922.

A. *The Present Dispute.*

Pursuant to 25 U.S.C. § 465, the Secretary of the Department of the Interior is authorized to acquire lands into trust "for the purpose of providing land for Indians." The BIA renders trust acquisition determinations on the secretary's behalf. In 1993, the tribe submitted an application requesting that the secretary take the par-

---

**6.** That portion of the district court's decision which granted injunctive relief was affirmed.

cel into trust for the Narragansetts' benefit. The tribe filed an updated application in July 1997. The present litigation pertains to the latter application.

On March 6, 1998, the BIA, through its eastern area director, Franklin Keel, notified the tribe, the state and the town of the secretary's intent to take the parcel into trust for the benefit of the Narragansetts. The town and the state, including its then-governor, Lincoln Almond, appealed the decision to the Interior Board of Indian Appeals ("the IBIA" or "the board"). On June 29, 2000, the board affirmed the BIA's determination. *Town of Charlestown v. E. Area Dir., Bureau of Indian Affairs*, IBIA 98–88–A and 98–89–A, 35 IBIA 93 (2000).

In affirming the BIA's decision, the board rejected the plaintiffs' challenges to several determinations made by the BIA in accepting the parcel into trust.[7] Specifically, the board concluded that the Settlement Act did not prohibit the secretary from acquiring lands other than the settlement lands into trust for the benefit of the Narragansetts. 35 IBIA 100–101. Also, the board rejected plaintiffs' argument that the BIA, either in all trust acquisition proceedings, or in view of the specific circumstances surrounding the tribe's trust application, was required to consider the possible use of the parcel for gaming purposes under the Indian Gaming Regulatory Act ("the IGRA"), 25 U.S.C. § 2701 *et seq.*, and to impose a restriction precluding such use. 35 IBIA at 101–103.

Further, the board concluded that the BIA did not violate the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 *et seq.* 35 IBIA at 104–105. Specifically, the bureau was not required to prepare a federal consistency determination for the proposed housing project as a prerequisite to trust acquisition of the parcel. *Id.* at 105.

Thereafter, plaintiffs instituted the instant action. As set forth more fully below, the plaintiffs allege that the secretary's acceptance of the parcel into trust was arbitrary, capricious, an abuse of discretion and/or otherwise not in accordance with law. Also, plaintiffs allege that the secretary lacked statutory authority to accept the parcel into trust and that the acquisition contravened the United States Constitution. Further, plaintiffs contend that 25 U.S.C. § 465 amounts to an unconstitutional delegation of legislative power to the executive branch of the federal government. The plaintiffs seek reversal of the secretary's decision and declaratory and injunctive relief.

## II. *Discussion*

Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The fact that both parties to a lawsuit move for summary judgment simultaneously does not relax the standards set forth in Rule 56. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). On the contrary, the Court "must consider each motion separately, drawing all inferences

---

7. Noting that it lacked jurisdiction to do so, the board did not address appellants' chal-lenge to the constitutionality of 25 U.S.C. § 465. 35 IBIA at 96–97.

against each movant in turn." *Id.* (quoting *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 603 n. 8 (1st Cir.1995)). The Court therefore "must view all facts and draw all inferences in the light most favorable to the nonmoving party." *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 6 (1st Cir.1997) (citing *Continental Cas. Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991)).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Summary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991) (citation omitted).

The Court's review of the secretary's determination is governed by 5 U.S.C. § 706 (2000), which provides in pertinent part: .

**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

A. *Whether the Secretary's Determination was Arbitrary, Capricious, an Abuse of Discretion or Otherwise not in Accordance with Law.*

The scope of the Court's review under § 706(2)(A) is highly deferential. *E.g., Conservation Law Found. of New England, Inc. v. Sec'y of Interior,* 864 F.2d 954, 957–58 (1st Cir.1989) (citations omitted). The Court presumes the agency's action to be valid. *Id.* A reviewing court "cannot substitute its own judgment for that of the agency." *Id.* at 958 (citation omitted). Rather, the Court "must determine whether the decision was based on a consideration of the relevant factors and whether the agency made a clear error of judgment." *Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 202 (1st Cir.1999) (citations omitted).

However, a reviewing court will not merely "rubber stamp" an agency decision. *Id.* at 203.

> If the Department "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency" we would be compelled to find its decision arbitrary and capricious.

*P.R. Higher Educ. Assistance Corp. v. Riley,* 10 F.3d 847, 850 (D.C.Cir.1993)(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

In alleging that the secretary's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, the plaintiffs cite several examples of the BIA's alleged failure to conduct an appropriate evaluation of the tribe's trust application. Specifically, plaintiffs complain that the BIA failed to properly examine the tribe's application in accordance with the factors enumerated in 25 C.F.R. § 151.10.[8] Moreover, plaintiffs contend that the BIA failed to conduct an independent evaluation of the tribe's application, relying instead on correspondence submitted by the tribe in support of its 1993 application, and disregarding issues arising and comments submitted by plaintiffs subsequent to 1993. Further, the plaintiffs allege that the BIA failed to assess the environmental impact of the proposed use of the parcel although the National Environmental Protection Act ("NEPA") and related regulations so required. Also, plaintiffs contend that the BIA abused its discretion in not causing a federal consistency review to be conducted prior to ac-

cepting the parcel into trust. Additionally, plaintiffs allege the BIA improperly failed to consider that the tribe and the town had not executed a local cooperation agreement. Finally, plaintiffs complain that the bureau failed to consider that trust acquisition of the parcel would render the property available for gaming use under the IGRA.

> 1. *The BIA's Alleged Failure to Conduct an Independent Evaluation of the Application and to Properly Evaluate the Trust Application in Accordance with 25 C.F.R. § 151.10.*

In contending that the BIA failed to conduct an independent evaluation of the tribe's 1997 trust application, the plaintiffs point out that substantial portions of an undated memorandum from the bureau's area realty officer to the eastern area director concerning the matter are verbatim restatements of arguments proffered by the tribe's legal counsel in support of its 1993 trust application. *Cf.* Admin. Rec., Vol. I, Tab D (11/4/93 Letter from Attorney John F. Killoy, Jr. to Bill D. Ott, Area Director, BIA Eastern Area Office) with Admin. Rec., Vol. II, Tab H (Undated Memorandum from Bill Wakole, Area Realty Officer to Area Director, Eastern Area Officer). In particular, plaintiffs allege that the BIA's determination to accept the parcel into trust was premised solely on the tribe's 1993 correspondence, and was made without consideration of other relevant factors, including those issues presented by plaintiffs in their comments regarding the 1997 application.

The plaintiffs' assertions that the bureau failed to conduct an independent evaluation of the trust application, including

---

**8.** Challenging the bureau's determination that the parcel is contiguous to the tribe's reservation, plaintiffs contend that the tribe's trust application should have been examined under

25 C.F.R. § 151.11 rather than § 151.10. However, the plaintiffs concede that the two provisions are substantially similar. Plfs.' Jt. Mem. Supp. M. Summ. J. at 24 n. 30.

plaintiffs' claim that the BIA failed to consider those issues raised in plaintiffs' comments, are belied by the administrative record. *See e.g.,* Admin. Rec., Vol. II, Tab L; Vol. III, Tab U, Exh. 19. After examining the record in its entirety, the Court is satisfied that the BIA's determination was based upon its own independent analysis and evaluation of the 1997 application.

Further, plaintiffs allege that, in evaluating the trust application, the BIA failed to adequately consider the factors enumerated in 25 C.F.R. § 151.10. Specifically, plaintiffs assert that the bureau failed to assess the tribe's need for additional land and the potential jurisdictional problems and land use conflicts which might arise. The regulation provides, in pertinent part:

On-reservation acquisitions.

. . .

The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:

(a) The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b) The need of the individual Indian or the tribe for additional land;

(c) The purposes for which the land will be used;

. . .

(e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f) Jurisdictional problems and potential conflicts of land use which may arise; and

(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

. . .

25 C.F.R. § 151.10

■ In reviewing the BIA's decision, the Court determines only whether the agency's decision was based on a consideration of the factors enumerated in § 151.10 and whether there has been a clear error of judgment. *McAlpine v. United States,* 112 F.3d 1429, 1436 (10th Cir.1997) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The Court does not engage in a weighing or balancing of the factors. *Id.* at 1434 (citing *Turri v. I.N.S.,* 997 F.2d 1306, 1308–09 (10th Cir. 1993)). "The court's obligation is not to engage in *de novo* review to satisfy itself that the agency made the correct decision, but only to ascertain that the decision made was based on rational consideration of the statutorily relevant factors." *City of Lincoln City v. U.S. Dep't of Interior,* 229 F.Supp.2d 1109, 1126 (D.Or.2002).

■ The record evinces that the BIA complied with § 151.10. Moreover, plaintiffs' arguments on this issue are, in substance, impermissible challenges to the *conclusions* reached by the BIA as a result of its consideration of the § 151.10 factors. The fact that the bureau, after conducting its own independent inquiry and analysis, reached conclusions similar to those urged by the tribe and contrary to those urged by plaintiffs does not by itself lead to an inexorable finding that the BIA's determination was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

2. *NEPA and the CZMA.*

The plaintiffs contend that the BIA's failure to require an environmental impact

statement ("EIS") as a prerequisite to its trust determination violated NEPA, 42 U.S.C. § 4321 *et seq.* Moreover, plaintiffs allege that the bureau, in concluding that no EIS was necessary, improperly relied on an environmental assessment submitted by the tribe instead of conducting its own independent inquiry. NEPA provides in pertinent part:

> The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
>
> . . .
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332 (2000).

■ An EIS need not be prepared in all circumstances. Rather, an EIS is required only where the proposed action will have a significant impact on the environ-

ment. *Londonderry Neighborhood Coalition v. Fed. Energy Regulatory Comm'n,* 273 F.3d 416, 419 (1st Cir.2001) (quoting *Wyoming Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 49 (D.C.Cir.1999)). An environmental assessment ("EA") is employed in determining this threshold issue.[9] *Id.* The EA need not be prepared by the federal agency itself. The assessment may be prepared by the applicant provided that the agency "make[s] its own evaluation of the environmental issues and take[s] responsibility for the scope and content of the environmental assessment." 40 C.F.R. § 1506.5(b).

■ In the instant matter, the tribe prepared and submitted an EA. Admin. Rec., Vol. II, Tab D, Exh. 9. The BIA reviewed the Narragansetts' assessment, sought and obtained additional environmental information from the tribe and, after conducting its own review of all pertinent information, independently concluded that no EIS was necessary. Admin. Rec., Vol. I, Tab S; Vol. I, Tab U; Vol. I, Tab Y; Vol. II, Tab B; Vol. II, Tab D, Exhs. 10, 11. The plaintiffs have failed to demonstrate that the BIA acted arbitrarily, capriciously or abused its discretion either in analyzing the issue or in determining that preparation of an EIS was not required. The handwritten comments, attributed to Jim Harriman, BIA Trust Services Environmental Officer, that appear on the face of the EA do not require a contrary conclusion. *See* Admin. Rec., Vol. I, Tab L.

■ The plaintiffs assert that the CZMA, 16 U.S.C. §§ 1451 *et seq.,* required the completion of a federal consistency review of the contemplated 50–unit housing project as a prerequisite to the secre-

---

**9.** Apparently, the parties agree that the acceptance of the parcel into trust amounts to a "major Federal action" within the meaning of 42 U.S.C. § 4332(2)(C).

tary's trust determination.[10] However, plaintiffs have not demonstrated that a consistency review of the anticipated development was necessary at the trust acquisition stage. The Rhode Island Coastal Resources Management Council ("the RICRMC"), the agency responsible for administering the state's coastal resources management plan, found that the application for trust status was consistent with the state's plan. Admin. Rec., Vol. II, Tab D, Exh. 11. As the CRMC recognized, development of the parcel was a separate matter which required its own federal consistency determination. *Id.* HUD's obligations under the CZMA are not before the Court for consideration.

### 3. *The Potential Use of the Parcel for Gaming Purposes.*

■ The plaintiffs assert that the bureau abused its discretion in accepting the parcel into trust without considering the potential use of the parcel for gaming activity under the IGRA, 25 U.S.C. §§ 2701–2721 (2000). Although not clear from the plaintiffs' memoranda, the Court views plaintiffs' argument as a challenge both to the BIA's determination that the tribe intended to use the parcel for housing purposes, *see* 25 C.F.R. § 151.10(c), and to its acceptance of the parcel into trust without restricting the use of the land to non-gaming purposes.

The IGRA was enacted by Congress in 1988, and, subject to certain restrictions, permits Indian tribes to engage in gaming activity on "Indian lands." 25 U.S.C. § 2710. "Indian lands" are defined as "all lands within the limits of any Indian reservation" and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." [11] 25 U.S.C. § 2703(4). However, except as otherwise provided in § 2719, "gaming regulated by [the IGRA] shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless ... such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988." 25 U.S.C. § 2719(a)(1).

The parties disagree as to whether the parcel satisfies the contiguity exception set forth in § 2719(a)(1). That issue is not before this Court for determination. The question is one to be determined at some future date, if and when the tribe seeks to use the parcel for gaming purposes. It is clear from the record that the BIA was

---

10. The CZMA provides, in pertinent part:

**Coordination and cooperation**
**(c) Consistency of Federal activities with State management programs ...**
(1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of the approved State management programs. A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).
. . .

**(C)** Each Federal agency carrying out an activity subject to paragraph (1) shall provide a consistency determination to the relevant State agency designated under section 1455(d)(6) of this title at the earliest practicable time, but in no case later than 90 days before final approval of the Federal activity unless both the Federal agency and the State agency agree to a different schedule.
16 U.S.C. § 1456 (2000).

11. As the plaintiffs correctly note, the settlement lands have been expressly excluded from the IGRA's definition of "Indian lands." 25 U.S.C. § 1708(b) (effective Sept. 30, 1996).

aware of the probability that, if accepted into trust, the parcel would qualify for use for gaming activities under the IGRA. *E.g.,* Admin. Rec., Vol. II, Tabs I, K, L. The bureau was cognizant of the plaintiffs' opposition to use of the realty for such purposes. However, there was no evidence that the tribe intended to use the parcel for other than tribal housing. In fact, after the plaintiffs expressed concern over the potential for development of a gaming facility on the parcel, the tribe reaffirmed that it intended to use the parcel for a housing development and stated that it had "no immediate plans for any further future development." Admin. Rec., Vol. II, Tab N.

In sum, although the possibility that the parcel might be used for gaming activities was raised before the BIA, the bureau's determination that the parcel would be used to provide housing was amply supported by the record. In view of the deferential standard of review afforded to agency decisions under the APA, the bureau's determination in this regard must be sustained. Similarly, the bureau's acceptance of the parcel into trust without imposing a land use restriction precluding gaming activity did not amount to an abuse of discretion. *Cf. Village of Ruidoso, New Mexico v. Albuquerque Area Dir., Bureau of Indian Affairs,* 32 IBIA 130, 1998 WL 233740 (1998) (although tribe orally denied any intention to use subject parcel for gaming purposes, several facts, including that the parcel was a gift to the tribe from a corporation which apparently had a business relationship with the tribe, and that the parcel was adjacent to and possibly being used to provide parking and shuttle service for tribe's on-reservation resort which housed a casino, required further BIA inquiry into whether the parcel would be used for gaming related activities).

### 4. The Absence of a Local Cooperation Agreement.

At the time of the bureau's determination, NAHASDA precluded HUD from providing housing grants absent the execution of a local cooperation agreement between the tribe and the municipality in which the housing was situated. *See* 25 U.S.C. § 4111(c), as amended through Pub.L. 105–276 (Oct. 21, 1998). No such agreement was executed between the tribe and the town concerning the parcel. The plaintiffs contend that, in deciding to accept the parcel into trust, the BIA improperly failed to consider the absence of a local cooperation agreement.

█ This argument is unpersuasive for at least two reasons. First, 25 U.S.C. § 4111(c) establishes a prerequisite to HUD's award of housing grants. It does not pertain to the BIA's trust acquisition authority. Second, § 4111(c) has been amended to permit HUD to waive the cooperation agreement requirement, 25 U.S.C. § 4111(c), as amended, Pub.L. 106–569, Dec. 27, 2000, and it appears that the tribe has obtained such a waiver.

### B. The Secretary's Authority to Accept the Parcel into Trust for the Benefit of the Narragansetts.

The plaintiffs proffer two arguments in support of their claim that the secretary lacked legal authority to accept the parcel into trust for the benefit of the Narragansetts pursuant to 25 U.S.C. § 465.[12] First,

12. Also, in their reply memorandum in support of their summary judgment motion and their objection to defendants' summary judgment motion, plaintiffs assert that 25 U.S.C. § 465 does not authorize the secretary to ac- cept into trust any lands that are owned in fee by a tribe. This claim was not specifically delineated in plaintiffs' complaint and was not addressed by the parties at oral argument. In any event, plaintiffs have not proffered any

plaintiffs contend that the trust acquisition authority conferred under § 465 is limited to acquisitions for the benefit of tribes that were federally recognized as of June 1934. Second, plaintiffs argue that the Settlement Act operates to preclude the secretary from acquiring additional land in trust for the benefit of the tribe.

### 1. *The Scope of the IRA.*

Section 465 provides in pertinent part:

The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments ... for the purpose of providing land for Indians.

...

Title to any lands or rights acquired ... shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired ....

25 U.S.C. § 465.

■ The applicable definitions of "Indian" and "tribe" are set forth in 25 U.S.C. § 479:

The term "Indian" ... shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood ... The term "tribe" ... shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. 25 U.S.C. § 479 (2000).

In substance, plaintiffs contend that the phrase "members of any recognized Indian tribe now under Federal jurisdiction" restricts the secretary's trust-taking authority to acquisitions made on behalf of tribes that were federally recognized as of the time of the IRA's enactment in June 1934. Under plaintiffs' analysis, any tribe, including the Narragansetts, that was afforded federal recognition subsequent to June 1934 does not qualify as an "Indian tribe" pursuant to § 479.

The plain language of § 479 does not impose such a limitation. The statute includes within the definition of "Indian," members of tribes in existence in 1934. When, as in the Narragansetts' case, a tribe existed in June 1934, and that tribe subsequently attained federal recognition, the fact that such acknowledgment occurred subsequent to the IRA's enactment date does not preclude trust acquisition for the benefit of the tribe pursuant to § 465. *See City of Sault Ste. Marie v. Andrus,* 532 F.Supp. 157, 161 (D.D.C.1980) ("[A]lthough the question of whether some groups qualified as Indian tribes for purposes of IRA benefits might have been unclear in 1934, that fact does not preclude the Secretary from subsequently determining that a given tribe deserved recognition in 1934."); *see also R.I. v. Narragansett Indian Tribe,* 19 F.3d 685, 694 (1st Cir.1994) ("Federal recognition is just that: recognition of a previously existing status").

The Fifth Circuit's analysis and determination in *United States v. State Tax Comm'n of Miss.,* 505 F.2d 633 (5th Cir. 1974), does not support a contrary conclusion. In *State Tax Comm'n,* the district

case law in support of their assertion and the Court finds that plaintiffs' argument is unsup-

ported by the clear language of § 465.

court enjoined the Mississippi State Tax Commission and the Neshoba County sheriff from assessing or collecting sales and contract taxes from the Mississippi Band of Choctaw Indians, the tribe's housing authority, and a non-profit corporation which had been formed by the tribal council for the purpose of engaging in the construction business. *Id.* at 635–37. On appeal, the Fifth Circuit reversed, concluding that the district court lacked subject matter jurisdiction. *Id.* at 643.

In so doing, the court of appeals concluded, *inter alia,* that the band was not an "Indian tribe" within the meaning of § 479 and, thus, that 28 U.S.C. § 1362 did not provide a basis for the district court's exercise of jurisdiction. *Id.* at 638. Specifically, the circuit court determined that: the band's tribal status had been extinguished by the United States Senate's ratification of the Treaty of Dancing Rabbit Creek in 1831; the Choctaws did not thereafter maintain a tribal organization or manner of living; in 1934, the band was not a tribe as defined by the IRA; and a 1944 proclamation by the Department of the Interior in which the department purported to recognize the tribe did not effectively confer the tribal status which was lacking in 1934. *Id.* at 640–43. With regard to the last point, the court of appeals stated: "The language of [25 U.S.C. § 479] positively dictates that tribal status is to be determined as of June, 1934, as indicated by the words 'any recognized Indian tribe now under Federal jurisdiction' and the additional language to like effect." *Id.* at 642.

Examined in the context of the court's analysis of the Choctaws' status, the above-quoted sentence does not evince that the Fifth Circuit understood § 479 as limiting tribal status to those tribes which were both existing and officially recognized as of June 1934. Rather, the statement simply indicates that tribal status that did not exist at the time of the IRA's enactment could not be "created" after that date. Specifically, in view of the uncontroverted evidence that the Mississippi Choctaws' tribal status had been extinguished prior to the IRA's enactment date, the tribe did not fall within § 479 and any post-enactment attempt to revive that status was of no consequence. Immediately following the above-quoted sentence, the Fifth Circuit continued as follows:

> The Mississippi Choctaws did not, in June, 1934 fall within the status prescribed by the Act. Their vote in 1935 to accept the benefits of the Act was not authorized by that statute. They could not confer upon themselves the benefit of a law in which, by its very terms, they had not been included.
>
> This omission was not, and could not have been, cured by a Proclamation of the Department of the Interior, grounded on the Act of 1934, which in 1944 purported to recognize the tribal organization of the Mississippi Band of Choctaw Indians and which attempted to declare that the lands purchased for their use and held for them in trust is an Indian Reservation.

*Id.* at 642–43.[13]

Unlike the Mississippi Choctaws, there can be no serious dispute concerning the Narragansetts' tribal status in 1934. "[T]he Narragansett community and its predecessors have existed autonomously since first contact, despite undergoing many modifications." Final Determination

---

**13.** In *United States v. John,* 437 U.S. 634, 650, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978) the Supreme Court determined that the Mississippi Choctaws were "Indians" within the definition set forth in § 479. Specifically, the defi-
nition includes persons of "one-half or more Indian blood" and "[t]here is no doubt that persons of this description lived in Mississippi, and were recognized as such by Congress

for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177, 6178 (Feb. 10, 1983). "The tribe has a documented history dating from 1614." *Id.*

In sum, as a federally-recognized tribe which existed at the time of the enactment of the IRA, the Narragansett tribe qualifies as an "Indian tribe" within the meaning of § 479. Thus, the secretary possesses authority under § 465 to accept lands into trust for the benefit of the Narragansetts.[14]

2. *The Impact of the Settlement Act on the Secretary's Authority under 25 U.S.C. § 465.*

■ The plaintiffs contend that, even if the Narragansetts qualify as an "Indian tribe" within the meaning of § 479, the Settlement Act precludes the acceptance of non-settlement lands into trust for the benefit of the tribe under § 465. The plaintiffs proffer three primary arguments in support of this contention. First, plaintiffs argue that the Settlement Act and the underlying JMOU preclude any further expansion of the area over which the tribe possessed jurisdiction. The plaintiffs assert that the secretary's acceptance of the parcel into trust is contrary to the purposes of the enactment and JMOU because it results in such an expansion and an accompanying divestiture of the state's jurisdiction and sovereignty over the property.[15] Second, plaintiffs contend that 25 U.S.C. § 1707(c) specifically extinguished the federal government's authority to acquire additional, non-settlement lands in trust for the benefit of the tribe pursuant to § 465. Third, plaintiffs allege that the secretary is precluded from accepting the

and by the Department of the Interior, at the time the [IRA] was passed." *Id.*

Of relevance to the instant matter is the Supreme Court's accompanying observation that the IRA "defined 'Indians' not only as 'all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction.'" *Id.* (parenthetical in original). The Supreme Court's parenthetical language provides some support for plaintiffs' assertion that whether a tribe was federally recognized in 1934 is determinative of its status. However, that issue was not before the Supreme Court for consideration and, in fact, the Court did not address the matter further. Under such circumstances, the district court declines to view the Supreme Court's parenthetical as determinative of the issue presented here.

14. The plaintiffs further contend that the legislative history of 25 U.S.C. § 479 reveals that Congress intended the term "Indian" to refer only to tribes federally recognized as of the date of the IRA's enactment. Since the Court finds no ambiguity on the face of the statute, it does not go further in an attempt to ascertain legislative intent. However, the Court has reviewed the Senate testimony referenced by plaintiffs and concludes that, contrary to plaintiffs' assertion of a more restrictive goal, the colloquy simply evinces a legislative intent to restrict the definition of "Indian" to members of aboriginal tribes, any of their descendants who are of at least one-half Indian blood, and any descendants of any degree of blood relationship who were residing on reservations as of June 1, 1934. · Hearing before the Senate Committee on Indian Affairs, 73rd Congress, May 17, 1934, at 264–267; Plaintiffs' Appendix, Vol. V. *See City of Sault Ste. Marie v. Andrus*, 532 F.Supp. 157, 161 (D.D.C.1980) ("[T]he apparent purpose of limiting IRA benefits to tribes recognized in 1934 was to prevent new groups from coming together solely to exploit the IRA . . . .")

Similarly, because the Court concludes that § 479 defines "Indian" to include members of aboriginal tribes that possessed tribal status in 1934 but were recognized subsequent to that date, it is not necessary for the Court to address the parties' respective arguments concerning whether 25 U.S.C. §§ 476 and 2202 require that § 479 be afforded an expansive interpretation.

15. *See Connecticut v. U.S. Dep't of Interior,* 228 F.3d 82, 85–86 (2nd Cir.2000) (citing 25 U.S.C. §§ 465, 1321(a), 1322(a); 25 C.F.R. § 1.4(a)) (noting that land taken into trust pursuant to the IRA is generally not subject to state or local taxation, local zoning and regu-

particular parcel at issue into trust because the parcel was part of the lands to which the tribe had asserted aboriginal title and that claim was resolved by the JMOU and the Settlement Act.

The Settlement Act provided for congressional ratification of any prior transfers of land or natural resources located anywhere in the United States that were made by or on behalf of the Narragansetts, their predecessors, or their successors in interest. 25 U.S.C. § 1705(a)(1). The enactment also provided for the ratification of any prior transfers of any land or natural resources located within the town of Charlestown that were made by any Indian, Indian nation, or Indian tribe. *Id.* The act provided for the extinguishment of any Indian claims of aboriginal title to such property as of the date of transfer. 25 U.S.C. § 1705(a)(2). The act further provided:

> [B]y virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims against the ·United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member or stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer.

25 U.S.C. § 1705(a)(3).

Similarly, the enactment provided for the ratification of any transfers of land or natural resources located within Rhode Island and outside of the town of Charlestown that were made by or on behalf of any Indian, Indian nation, or Indian tribe (other than transfers included in § 1705). 25 U.S.C § 1712(a)(1). Aboriginal title to such land or natural resources was regarded as extinguished as of the date of transfer. 25 U.S.C. § 1712(a)(2). In addition:

> [B]y virtue of the approval of such transfers of land or natural resources effected by this subsection or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by any such Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or rights involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy), shall be regarded as extinguished as of the date of the transfer.

25 U.S.C. § 1712(a)(3).

The Settlement Act does not expressly preclude or otherwise restrict the acceptance of non-settlement lands into trust for the benefit of the Narragansetts pursuant to 25 U.S.C. § 465. Moreover, plaintiffs have not demonstrated that either Congress or the settling parties intended to impose such a limitation.

 In ascertaining congressional intent, courts are guided by the general principle that "statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." *Chickasaw Nation v. United States*, 534 U.S. 84, 93–94, 122 S.Ct. 528,

latory requirements, or, absent tribal consent, state criminal and civil jurisdiction.)

151 L.Ed.2d 474 (2001) (quotation and citations omitted). In particular, statutes that impact upon Indian sovereignty are viewed from a "distinctive perspective." *Narragansett Indian Tribe of R. I.*, 89 F.3d at 914 (quoting *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 691 (1st Cir. 1994)). "[I]t is well established that '[a] congressional determination to terminate [a reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history.'" *Id.* (quoting *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973)).

Although §§ 1705 and 1712 reveal an intent to resolve *all* claims, whether for possession or damages, that are premised upon the Narragansetts' assertions of aboriginal right, the provisions do not reveal an intent to otherwise restrict the tribe's legal rights and privileges, including those benefits which became available to the tribe upon attaining federal acknowledgment in 1983.[16] Specifically, the Settlement Act does not impair the tribe's ability, as a federally recognized tribe, to seek § 465 trust acquisition of lands that it acquires by purchase with non-settlement funds.

The JMOU does not evince a contrary intent on the part of the settling parties. Paragraph 6 of the JMOU provides in pertinent part:

> Federal legislation shall be obtained that eliminates all Indian claims of any kind, whether possessory, monetary or otherwise, involving land in Rhode Island, and effectively clears the titles of landowners in Rhode Island of any such claim.

The provision reveals the settling parties' intention to resolve all claims arising out of the Narragansetts' assertions of aboriginal right to lands located within the state and to remove any clouds on the title to that realty. As is the case with §§ 1705 and 1712, paragraph 6 does not indicate an intent to otherwise limit the tribe's legal rights and privileges including those benefits incident to federal recognition. In fact, paragraph 15 demonstrates that the parties recognized that the Narragansetts were entitled to seek federal acknowledgment and its attendant benefits:

> [T]he plaintiff in the Lawsuits will not receive Federal recognition for purposes of eligibility for Department of Interior services as a result of Congressional implementation of the provisions of this Memorandum, *but will have the same right to petition for such recognition and services as other groups.*

(Emphasis added).

The plaintiffs' reliance on 25 U.S.C. § 1708(a) to support their contention that the Settlement Act forecloses the acceptance of the parcel into trust pursuant to § 465 is misplaced because that provision is expressly limited in application to "settlement lands." Section 1708(a) provides: "Except as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." The provision does not speak to non-settlement acquisitions and, accordingly, does not evince a congressional intent to foreclose § 465 trust acquisitions of non-settlement lands on the Narragansetts' behalf.

---

16. Similarly, the enactment's legislative history reveals that Congress' intent in passing the Settlement Act was to resolve the Narragansetts' aboriginal land claims. *See* H.R. Rep. 95–1453, U.S.Code Cong. & Admin. News 1978, pp. 1948, 1949 (purpose of Settlement Act was "to implement a settlement agreement between the Narragansett Indian Tribe and the State of Rhode Island and private landowners in Charlestown, Rhode Island concerning the tribe's claim to certain land within the Town of Charlestown and for damages for trespass on such lands").

The plaintiffs argue that acceptance of non-settlement lands into trust will diminish the state's sovereignty and jurisdiction over one or more "islands" of land within the state's borders. However, the potential for such a result does not provide a basis for construing the Settlement Act as foreclosing future trust acquisitions. "[C]heckerboard jurisdiction is not novel in Indian law .... " *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* 439 U.S. 463, 502, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). "While we might question the wisdom of different jurisdictional provisions governing different trust lands, we will not provide a strained interpretation of the [Connecticut Indian Claims] Settlement Act simply to avoid such a result." *Connecticut v. U.S. Dep't of Interior,* 228 F.3d 82, 91 (2nd Cir.2000). Rather, plaintiffs' argument is more appropriately one for presentation to Congress in seeking amendment of the Settlement Act.

Next, plaintiffs contend that 25 U.S.C. § 1707(c) extinguished the secretary's authority to accept non-settlement lands into trust for the benefit of the Narragansetts. The provision provides:

**Duties and liabilities of United States upon discharge of Secretary's duties; restriction on conveyance of settlement lands; affect on easements for public or private purposes**

Upon the discharge of the Secretary's duties under sections 1704, 1705, 1706, and 1707 of this title, the United States shall have no further duties or liabilities under this subchapter with respect to the Indian Corporation or its successor, the State Corporation, or the settlement lands: *Provided, however,* That if the Secretary subsequently acknowledges the existence of the Narragansett Tribe of Indians, then the settlement lands may not be sold, granted, or otherwise conveyed or leased to anyone other than the Indian Corporation, and no such disposition of the settlement lands shall be of any validity in law or equity, unless the same is approved by the Secretary pursuant to regulations adopted by him for that purpose: *Provided, however,* That nothing in this subchapter shall affect or otherwise impair the ability of the State Corporation to grant or otherwise convey (including any involuntary conveyance by means of eminent domain or condemnation proceedings) any easement for public or private purposes pursuant to the laws of the State of Rhode Island.

25 U.S.C. § 1707(c).

Subsection 1707(c) does not expressly preclude the secretary from acquiring additional lands in trust for the benefit of the Narragansetts. *Cf.* 25 U.S.C. § 1724(e) ("Maine Indian Claims Settlement Act") ("Except for the provisions of this subchapter, the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians or Indian nations, or tribes, or bands of Indians in the State of Maine."). Moreover, such a restriction cannot be reasonably inferred.

As previously set forth, the Narragansetts did not obtain federal acknowledgment of their tribal status until 1983. Thus, at the time of the Settlement Act's enactment in 1978, the secretary lacked authority to accept lands into trust for the benefit of the tribe pursuant to § 465. However, the possibility that the tribe subsequently would obtain federal recognition was contemplated at the time of the Settlement Act's passage. *See* 25 U.S.C. § 1707(c) (expressly restricting conveyance of settlement lands to anyone other than the tribe in event of recognition). Having foreseen the possibility of future federal acknowledgment of the tribe, Con-

gress could have expressly limited the secretary's authority to accept additional lands into trust for the Narragansetts' benefit. It did not do so and the Court will not infer such an intent.

This Court's determination is consistent with the Second Circuit's analysis in *Connecticut v. U.S. Dep't of Interior, supra*. In that matter, the court of appeals, in reversing the district court's determination, concluded that the Connecticut Indian Land Claims Settlement Act, 25 U.S.C. §§ 1751–60 ("the Connecticut Settlement Act"), did not preclude the secretary from accepting into trust certain lands which neither were within the boundaries of the area designated by the enactment as "settlement lands" nor had been purchased with settlement funds. *Connecticut*, 228 F.3d at 88. The Connecticut enactment extinguished the Mashantucket Pequot's aboriginal land claims. 25 U.S.C. § 1753. In exchange, the act, *inter alia*, established a fund designed primarily to acquire private lands on behalf of the tribe. 25 U.S.C. § 1754. The enactment designated lands within a specific geographical area as "settlement lands." 25 U.S.C. §§ 1752(3), (4). Lands contained within that geographical area that were purchased with settlement funds were to be held in trust by the United States for the benefit of the tribe. 25 U.S.C. § 1754(b)(7). However, lands acquired with settlement funds but located outside the area designated as "settlement lands" were to be held in fee by the tribe.

**Mashantucket Pequot Settlement Fund**

. . .

**(b) Expending of Fund; private settlement lands; economic development plan; acquisition of land and natural resources**

. . .

(8) Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe, and the United States shall have no further trust responsibility with respect to such land and natural resources.

25 U.S.C. § 1754(b)(8).

At issue in *Connecticut v. U.S. Dep't of Interior* was whether the Connecticut Settlement Act precluded the secretary from acquiring into trust lands owned in fee by the tribe that were neither acquired with settlement funds nor located within the area designated as "settlement lands." 228 F.3d at 87. The district court, finding that Congress intended the statute to establish the geographical limits of the tribe's sovereignty, concluded that § 1754(b)(8) precluded the secretary from acquiring non-settlement lands purchased with non-settlement funds into trust for the tribe's benefit. *Id.* The Second Circuit reversed, holding that the subsection applied only to lands purchased with settlement funds. *Id.* at 88. In so doing, the court of appeals found the Connecticut Settlement Act to be unambiguous on the issue. *Id.* Moreover, even if some ambiguity existed, principles of statutory construction supported the appellate court's interpretation. In particular, the Second Circuit, citing language contained in the Connecticut Settlement Act that is nearly identical to that set forth in Rhode Island's Indian Claims Settlement Act, noted:

The Settlement Act was not . . . a comprehensive statute intended to settle once-and-for-all the extent of the Mashantucket Pequot's sovereignty. Rather, it emerged from the specific land dispute arising out of the 1976 lawsuits filed by the Tribe. The congressional findings contained within the Settlement Act itself suggest that the purpose of the Act was more parochial than the

Connecticut plaintiffs contend. The statute recites that "the pendency of [the Tribe's] lawsuit has placed a cloud on the titles to much of the land in the town of Ledyard, including lands not involved in the lawsuit, which has resulted in severe economic hardships for the residents of the town." ... [T]he Act continues, "Congress shares with the State of Connecticut and the parties to the lawsuit a desire to remove all clouds on titles resulting from such Indian land claims." ... Congress saw the Settlement Act as providing the necessary federal implementation of the private agreement negotiated between the parties that would end the existing lawsuit.... Nothing in the Act indicates that Congress intended to establish the outermost boundaries of the Tribe's sovereign territory.

*Id.* at 90; *cf.* 25 U.S.C. § 1701.

■ Finally, the plaintiffs assert that, regardless of whether the Settlement Act imposes a general prohibition on the secretary's acceptance of lands into trust for the benefit of the Narragansetts, acquisition of the specific parcel at issue in this proceeding is precluded by the doctrine of res judicata or, as described by plaintiffs at oral argument, an analogous theory. *Tr.* (10/9/2002) at 24–25. The plaintiffs note that the parcel was among the lands to which the tribe asserted a claim of aboriginal right in the 1975 litigation. Because the Narragansetts' claims concerning the parcel were among those resolved by the JMOU and the Settlement Act, plaintiffs contend that the tribe is precluded from now attaining sovereignty over the parcel through trust acquisition.

The plaintiffs' argument is without merit. "[T]he doctrine of res judicata operates to bar the relitigation of issues that were or could have been raised in an earlier action between the same parties prescinding from the same set of operative facts." *In re Carvalho,* 335 F.3d 45, 49 (1st Cir.2003) (citations omitted). The federal government was not a party to the 1975 litigation or to the JMOU.[17] Moreover, the secretary's fee-to-trust acquisition of the parcel and the consequences of that action are matters that are separate and distinct from the claims of aboriginal right which the JMOU and the Settlement Act were intended to resolve.

### C. *The IRA and the Nondelegation Doctrine.*

■ The plaintiffs contend that 25 U.S.C. § 465 amounts to an unconstitutional delegation of legislative authority to the executive branch of the federal government. Specifically, the plaintiffs assert that the statute confers decision-making authority upon the secretary without articulating sufficient standards to guide the secretary's trust determinations.

Article I, Section I, of the United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." "In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency ... [Article I, Section I] permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (citations omitted). Accordingly, "when Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Id.* (quoting *J.W. Hampton, Jr., & Co. v.*

---

**17.** Additionally, the Narragansetts are not a party to the instant action.

*United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)).

In support of their claim that § 465 amounts to an impermissible delegation of congressional authority to the secretary, the plaintiffs rely primarily on the Eighth Circuit's determination to that effect in *South Dakota v. U.S. Dep't of Interior*, 69 F.3d 878 (8th Cir.1995). However, on certiorari, the Supreme Court vacated the circuit's decision. 519 U.S. 919, 117 S.Ct. 286, 136 L.Ed.2d 205 (1996) (granting petition for certiorari, vacating judgment and remanding matter to the Secretary of the Interior for reconsideration of the secretary's administrative decision). The Supreme Court did not publish an opinion setting forth the majority's reasoning on the issue.

Following the Supreme Court's decision in *South Dakota*, the Tenth Circuit addressed the validity of Congress' delegation of trust acquisition authority under § 465. *United States v. Roberts*, 185 F.3d 1125 (10th Cir.1999). In *Roberts*, the Tenth Circuit upheld a district court determination that the delegation was proper. In so doing, the court of appeals noted that the statute itself placed ample limits on the secretary's exercise of discretion. *Id.* at 1137 (citations omitted).

This Court finds the Tenth Circuit's analysis to be persuasive. Accordingly, for the same reasons articulated in *Roberts*, the Court rejects plaintiffs' claim that § 465 is an unconstitutional delegation of legislative authority to the secretary.

### D. *The Constitutionality of the Trust Acquisition.*

The plaintiffs contend that acceptance of the parcel into trust amounts to a violation of Article I, Section 8, Clause 17 ("the Enclave Clause"), and Article IV, Section 3, Clause 1 ("the Admissions Clause"), of the United States Constitution.[18] Also, plaintiffs allege that the action is violative of the Tenth Amendment.[19] In substance, plaintiffs allege that the trust acquisition will result in a diminishment of the state's sovereignty without its consent, in violation of these provisions and in excess of Congress' authority under Article I, Section 8, Clause 3 ("the Indian Commerce Clause"), of the Constitution.

### 1. *The Enclave Clause.*

 The Enclave Clause provides Congress with the authority:

> To exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. Art. I, § 8, cl. 17. Absent state consent, the clause precludes the federal government from establishing within a state an enclave which is exclusively subject to federal jurisdiction. *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652, 50 S.Ct. 455, 74 L.Ed. 1091 (1930); *City of Roseville v. Norton*, 219 F.Supp.2d 130, 149

---

**18.** The plaintiffs' complaint does not specifically allege violation of Article IV, Section 3, however, the parties have fully briefed and argued this issue.

**19.** In Count XI of their complaint, the plaintiffs assert that the secretary's action is viola-

tive of the Eleventh Amendment. However, the plaintiffs failed to articulate the basis for this claim in their complaint, in their memoranda, or during oral argument. Accordingly, the Court determines that the Eleventh Amendment claim has been waived.

(D.D.C.2002). The relevant inquiry is whether "the United States has acquired *exclusive* legislative authority so as to debar the State from exercising *any* legislative authority including its taxing and police power, in relation to the property and activities of individuals and corporations within the territory." *Silas Mason Co. v. Tax Comm'n of Wash.*, 302 U.S. 186, 197, 58 S.Ct. 233, 82 L.Ed. 187 (1937) (emphasis added). A less than complete ouster of the state's jurisdiction does not trigger Enclave Clause concerns. *City of Roseville*, 219 F.Supp.2d at 150–51.

The Supreme Court has described an Indian reservation as an example of an area not amounting to a federal enclave. *Surplus Trading Co.*, 281 U.S. at 650–51, 50 S.Ct. 455. More recently, in *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), the Supreme Court reaffirmed that the states retain a degree of jurisdiction over reservation lands.

> Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border....
>
> That is not to say that States may exert the same degree of regulatory authority within a reservation as they do without. To the contrary, the principle that Indians have the right to make their own laws and be governed by them requires "an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other."

*Id.* at 361–62, 121 S.Ct. 2304 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)).

Accordingly, because such an action does not result in a complete ouster of state jurisdiction, this Court agrees with the district court's conclusion in *City of Roseville* that the acceptance of land into trust for the benefit of an Indian tribe does not amount to the creation of a federal enclave. 219 F.Supp.2d at 150. Therefore, the secretary's acceptance of the parcel into trust for the benefit of the Narragansetts does not amount to a violation of the Enclave Clause. *See id.* at 152.

### 2. The Admissions Clause.

Article IV, Section 3, Clause 1 of the Constitution provides:

> Admission of new states.
>
> New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

■ In contending that the acceptance of the parcel into trust is violative of the Admissions Clause, plaintiffs attempt to equate trust status and its attendant diminishment of state jurisdiction with the creation of a new, independent state. In part, plaintiffs premise their claim on the probability that, once placed in trust, the parcel will qualify as a "dependent Indian community" and, thus, as "Indian country" as defined by 18 U.S.C. § 1151 *See Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co.*, 89 F.3d at 920.

In any event, plaintiffs' claim fails because it is based upon an overly broad definition of "state" as that term is employed in Article IV, Section 3. As used therein, "state" refers to a body *equal* in power to those of the existing states. *Coyle v. Smith*, 221 U.S. 559, 566–67, 31 S.Ct. 688, 55 L.Ed. 853 (1911). *City of Roseville*, 219 F.Supp.2d at 152. Article

IV, Section 3, confers upon Congress the power to admit "[n]ew States . . . into this Union." " 'This Union' was and is a union of States, equal in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle*, 221 U.S. at 567, 31 S.Ct. 688. Conversely, the power to admit states does not confer authority "to admit political organizations which are less or greater, or different in dignity or power, from those political entities which constitute the Union." *Id.* at 566, 31 S.Ct. 688.

As set forth in *Nevada v. Hicks, supra,* tribal lands remain subject to some degree of state regulation. Thus, there can be no serious dispute that trust acquisition does not confer statehood status. "[T]he taking of land into trust [for the benefit of the tribe] in no way creates an entity equal to the State . . . or to the other states in the union." *City of Roseville*, 219 F.Supp.2d at 153; *see White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (noting that "[t]ribal reservations are not States").

### 3. *The Tenth Amendment.*

▆▆ Finally, plaintiffs allege that the secretary's acceptance of the parcel into trust amounts to an abrogation of the state's sovereignty in violation of the Tenth Amendment to the United States Constitution, and in excess of the federal government's authority under the Indian Commerce Clause.

"The Constitution created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X.

In a case . . . involving the division of authority between federal and state governments, the two inquiries are mirror images of each other. If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress.

*New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

The Constitution confers upon Congress the power "[t]o regulate commerce . . . with the Indian tribes." U.S. Const. Art. I, Sec. 8, Cl. 3. It is well settled that Congress has "plenary power . . . to deal with the special problems of Indians." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). This includes the power to legislate. *Id.* at 552, 94 S.Ct. 2474. Accordingly, because the power to regulate Indians is one conferred on the federal government, the Tenth Amendment does not reserve such authority to the States. *City of Roseville*, 219 F.Supp.2d at 154. Thus, plaintiffs' claim of Tenth Amendment violation is without merit. *Id.*

However, the plaintiffs contend that unique circumstances exist concerning the relationship between the state and the Narragansetts and that, in view of such circumstances, the secretary's acceptance of the parcel into trust has, in fact, resulted in an abrogation of the state's sovereignty in contravention of the Tenth Amendment. First, plaintiffs attempt to distinguish the situation presented here by asserting the state consistently has possessed sovereignty over all lands within its borders. For the reasons set forth in the

190

preceding two paragraphs, this argument is devoid of merit.

Second, plaintiffs rely on their assertion that the Settlement Act was intended to preclude any further expansion of the area over which the tribe could exercise sovereignty. As previously discussed, the Settlement Act was limited in scope to a resolution of the Narragansetts' claims of aboriginal right to lands. It did no more. Specifically, the enactment does not restrict the tribe's ability to exercise its sovereignty over lands that it subsequently acquires by purchase. Therefore, plaintiffs' argument to the contrary fails.

### III. *Conclusion.*

For the above reasons: (1) the motion of the plaintiffs, Donald L. Carcieri in his capacity as Governor of the State of Rhode Island, the State of Rhode Island, and the Town of Charlestown for entry of summary judgment is denied; and (2) the motion of the defendants, Gale A. Norton, in her capacity as Secretary of the United States Department of the Interior, and Franklin Keel, in his capacity as Eastern Area Director of the Bureau of Indian Affairs, United States Department of the Interior, United States of America is granted. Judgment shall enter in favor of the defendants.

IT IS SO ORDERED.